**RECEIVED**

APR − 5 2016

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

KIRBY SEMIEN                              CIVIL ACTION NO.: 6:14-cv-1087

VERSUS                                    JUDGE DOHERTY

PARKER DRILLING OFFSHORE USA LLC          MAGISTRATE JUDGE HANNA

<u>TRIAL RULING</u>

I.   <u>Introduction</u>

This matter involves claims brought by the plaintiff, Kirby Semien, against defendant, Parker

Drilling Offshore USA, LLC ("Parker Drilling"), under the Jones Act and the general maritime law.

At the time of his alleged injury, Mr. Semien was employed by Parker Drilling as a shakerhand and

alleges on May 22, 2014 he injured his right knee while working aboard the Inland Drilling Rig 54B,

which was owned by Parker Drilling. Mr. Semien asserts a claim under the Jones Act, and under the

general maritime law for unseaworthiness, and maintenance and cure, and designated this as an

action brought under the admiralty within the meaning of Rule 9(h) of the Federal Rules of Civil

Procedure.  Trial of this matter was to the bench, commencing on March 7, 2016, with closing

arguments heard on March 10, 2016.  Jurisdiction in this matter is premised upon the admiralty law

of the United States of America, 28 U.S.C. 1333(1) (Admiralty, Maritime and Prize Cases), the Jones

Act, 46 U.S.C. §30104, and the general maritime law, and venue is proper in the Western District

of Louisiana.

II.  <u>Procedural History</u>

On June 3, 2014, Kirby Semien filed a Complaint in the United States District Court for the

Western District of Louisiana against his former employer, Parker Drilling Offshore Corporation. By amended complaint filed on July 23, 2014 [Doc. 3], Mr. Semien amended his complaint to allege his claims against Parker Drilling Offshore USA, LLC. On September 16, 2015, Parker Drilling filed a motion for summary judgment seeking dismissal of certain claims for damages [Doc. 17] and a motion for summary judgment on liability. The damages motion was granted in part [Docs. 26 & 27], while the liability motion was denied [Docs. 32 & 33].

This matter proceeded to a bench trial on March 7, 2016. All evidence has been taken and all arguments have been made to the Court and this Court now makes the following findings of fact, conclusion of law, and rules as follows.

### III.    **Factual Background**

Kirby Semien was working as a shakerhand on Rig 54B on the date of the accident. It was established the well was experiencing certain well control problems, which were being addressed and monitored. Prior to running the Bottom Hole Assembly ("BHA") in the well, 135 barrels of water were pumped down the annulus. As the BHA is run in the hole, a portion of the 135 barrels of water which had been added should at some point return through and to the trip tanks, if all is operating properly; Kirby Semien was assigned the task of monitoring the amount of liquid coming back into the trip tanks. This is a job that is performed on the shaker deck and under normal circumstances, would not require Kirby Semien to go to the bottom deck where his accident occurred.

There were two trip tanks on Rig 54B. Mr. Semien testified that on the morning of the accident, he was working on the shaker deck monitoring the tanks located above the bottom deck. Mr. Semien testified the first tank had filled and needed to be emptied before the second, also, filled. He testified that if the trip tanks were not emptied, they could overflow or the water and liquid could

back up into the oil based mud tanks creating undesirable consequences. Mr. Semien testified he believed if the trip tanks overflowed, the overflow could result in an environmental spill of drilling fluid, or if they backed up the water could contaminate the oil based mud found in the mud tanks. It was Mr. Semien's responsibility to not only monitor the return in the tanks, but also, to manage those tanks. Thus, once the first of the two tanks was filled, Mr. Semien switched the flow to the second tank and attempted to pump the first. However, the pumps did not work. Mr. Semien then went to adjust the manifold, which, again, did not fix the problem. Mr. Semien, then, added another pump, and, yet again, the pumps did not work.

Mr. Semien explained that, normally, the fluid from the trip tanks can be dumped and/or drained by activation of the trip tank pumps, however, as both pumps malfunctioned, Mr. Semien testified the trip tanks would have to be emptied manually by way of two manual valves found on the bottom deck. The two manual dump valves are located 13'-14'[1] above the floor of the bottom deck on Rig 54B and must be physically manipulated, "by hand". When Rig 54B was originally constructed, there was a permanently affixed ladder connected to the deck providing safe access to the manual dump valves. This permanently affixed ladder, also, had a "LadSafe" system which worked in concert with the ladder and harness allowing workers to attach their harness to the permanently affixed ladder and allowing the attached safety harness to run along the side of the ladder as employees moved up and down the ladder. Steve Villejoin, the tool pusher, testified this fixed ladder was removed from the rig when it was refurbished; no evidence was provided why the fixed ladder was removed or why it was not replaced. Thus, Rig 54B was left with a known and necessary work area some 13'8" above floor level with no rig access. It was this area some 13'8" above the floor that Mr. Semien or other Parker Drilling employees would have to access in order

---

[1] Plaintiff's Exhibit 16, p. 15; Defendant's Exhibit 4, p. 2.

to manually dump the trip tanks.

Mr. Semien testified that after he recognized the trip tank pumps were not working, he called his direct supervisor, the driller – Fred Landry – and informed him of the situation.  Mr. Landry told him to get the crane operator – Keyomi Palfrey -- to go to the bottom deck with a roustabout and for Palfrey and the roustabout to open the dump valves manually.  Mr. Semien, thereafter, called Mr. Palfrey, explained the situation and Palfrey agreed to come dump the tanks as requested in about ten minutes,  after he completed a permit he was working on.  Testimony was submitted the permit in question would take approximately five-ten minutes to complete, and Parker Drilling's post-accident investigation reflects Palfrey told Semien he would be there in about ten minutes.  See: Plaintiff's Exhibit 16, p. 11, para. 6; p. 17.  Palfrey was with the toolpusher, Steve Villejoin, when he received Mr. Semien's call and request for help, and Palfrey and the toolpusher discussed Mr. Semien's call once the call was completed.  Notwithstanding telling Mr. Semien that he was coming in about ten minutes , Mr. Palfrey did not, in fact, go to help Mr. Semien as requested by Mr. Semien, or as he had  promised.  Rather, Palfrey and the toolpusher, Villejoin, went either to the pump room or the mud room - Palfrey could not recall which, but in any event, neither went to assist Mr. Semien - and Mr. Palfrey worked there for a time until he went to the bottom deck, some 45 minutes later, not to provide the requested help, but to find a tool needed for the other job.  Consequently, Palfrey found Mr. Semien, lying on the deck by happenstance, some forty-five minutes later and in fact, never came to provide the promised help.

Mr. Semien testified he was concerned the trip tanks would overflow or back up and lead to undesirable consequences if the tank was not drained.  Consequently, when Palfrey did not come, as promised, Mr. Semien attempted to call Palfrey a second time to find out why he had not come; Palfrey did not answer.  Palfrey, whom this Court found to be a poor historian, could not remember

if a second call was attempted, and testified he might not have heard it even if it had been made, as he was working in the pump or mud room by this time. Mr. Semien testified he felt pressured, therefore, consequently, he at some point thereafter, again, called Fred Landry, the driller, Mr. Semien's direct supervisor, and told him he was "going down" to the bottom deck, and Mr. Landry told him "to be safe". Mr. Landry, also, testified he could not remember whether or not Mr. Semien called a second time. This Court, however, finds it credible that Mr. Semien would have called his driller if only to tell the driller he was leaving his assigned station and task of monitoring and communicating the return coming into the tanks from the well, especially as testimony established Landry and Semien were in consistent contact concerning the return flowing into the tanks given the earlier well issue of losing drilling fluid into the well formation.

Consequently, after, again, calling the driller, Mr. Semien went to the bottom deck to get all ready for Palfrey and his helper so as to expedite the dump of the tanks. Mr. Semien obtained a life vest, put it on, got the "elephant hose" needed to dump the tanks and ran it down to the barge for the dump, and set up for Palfrey. As Palfrey still had not arrived as promised, Mr. Semien testified he went to the floor access from where he could see the tank level indicator and saw that the second tank was quickly filling up. Mr. Semien testified that at that point he made the choice to dump the tanks himself as he had twice called Palfrey, twice called the driller, the second tank was quickly reaching its fill level and feared undesirable consequences if the tank backed up or overflowed.

Up to this point, Mr. Semien had fully complied with all instruction and existing Parker Drilling policy. Mr. Semien testified he "was rushing" because of his concern about the second tank level. He, further, testified he obtained the only ladder in the equipment bin where such equipment was stored on that level - an extension ladder. He testified he did not get a safety harness as there were none stored on that floor and he did not feel he should spend the time to go one floor up and

get a harness, and then decided, given the tank level, he should not wait any longer.  Thereafter, Mr. Semien wedged the extension ladder against the round manhole cover, on the wet rig floor, and rested the top of the ladder against the large pipe some 13'8" above the rig floor in the vicinity of the two manual valves, and as Palfrey still had not arrived, he climbed the ladder and while in the process of attempting to manipulate the dump valve himself, the ladder shifted and he fell to the rig floor where he lay for some time until discovered by Palfrey, some forty-five minutes after Mr. Semien had first called for Palfrey's help.

Mr. Semien sustained undisputed traumatic injury to his knee, underwent two surgical procedures to his knee, with another arthroscopic procedure having been recommended, and has not worked since the incident.

## IV.   Stipulations and Admissions

The parties also stipulated to the following facts:

- Kirby Semien was employed by Parker Drilling Offshore, USA, LLC on May 22, 2013.

- Inland Drilling Rig 54B was owned by Parker Drilling USA, LLC on May 22, 2013.

- Parker Drilling Offshore USA, LLC paid Kirby Semien maintenance benefits in the amount of $35 per day until Dr. Jonathan Shults stated Mr. Semien had reached maximum medical cure on May 15, 2014.

- The proper rate of maintenance benefits is $35 per day.

- Parker Drilling Offshore ISA, LLC paid advances to Mr. Semien in the amount of $24,614.48 and is entitled to a credit for that amount.

- Mr. Semien visited Tamatha Newman, Nurse Practitioner, who referred Mr. Semien to Dr. David Clause, an orthopedic surgeon.  Based on this stipulation, the parties agreed not to use the medical records or the deposition of Ms. Newman.

- Parker Drilling Offshore USA, LLC paid all medical bills prior to May 15, 2014.

[Doc. 35, p. 16].[2]

## V.   Applicable Law

### A.   Jones Act Negligence

The Jones Act allows an injured seaman to bring an action against his employer for negligence. 46 U.S.C. §30104). The injured person bears the burden of establishing seaman status. *Becker v. Tidewater*, 335 F.3d 376 (5th Cir. 2003). To determine if an individual worker is a seaman, and, therefore, entitled to the protections of the Jones Act, the Supreme Court has established a two-prong test. First, "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Becker,* 335 F.3d at 387 *quoting Chandris, Inc. v. Latsis,* 515 U.S. 347, 368, 115 S.Ct. 2172 (1995). Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature." *Id.*

The Jones Act employer's possible liability extends to all personal injuries arising during the course of the seaman's employment, caused by the employer's negligence; proof of negligence is essential to recovery. Such negligence may arise in many different ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the work place, failure to inspect the work place for hazards, failure to take precautions to protect a seaman or any other breach of the duty of care. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir. 1977), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997); Thomas J. Schoenbaum, Admiralty and Maritime Law, §6-21 (4th

---

[2] Mr. Semien, also, stipulated he would not present any evidence that he would have worked beyond normal retirement age; and that John Theriot would not testify as to loss of earning capacity through age 67. [Doc. 39, Exhibit A].

ed.2004).

The duty of care owed by a Jones Act employer is that of ordinary prudence, namely, the duty to take reasonable care under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338-39 (5th Cir. 1997). "[T]he employer must have notice and the opportunity to correct an unsafe condition before liability attaches." *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989). "The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" *Colburn,* 883 F.2d at 374.

The seaman must, also, meet the evidentiary burden of proving that a breach of a duty owed by the employer was a legal cause of his injures. *See Davis,* 549 F.2d at 331, *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997). It is plaintiff's burden to show, by a preponderance of the evidence, that the employer's negligence was the cause, in whole or in part, of plaintiff's injuries. *See CSX Transp., Inc. v. McBride,* 131 S.Ct. 2630, 2636 (U.S. 2011).

"[T]he standard is one of 'producing cause' rather than 'proximate cause' and . . . the burden of proof is 'featherweight.' Thus, two concepts come into play here—the type of causation that must be shown (producing) and the plaintiff's burden to show that cause (featherweight)." *Clark v. Kellogg Brown & Root L.L.C.*, 414 Fed.Appx. 623, 626 (5th Cir. 2011)(*citing Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60, 62 (5th Cir.1982)).

A seaman, also, however, is obligated under the Jones Act to act with ordinary prudence under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997). And, thus, comparative fault may apply to reduce a seaman's recovery on a Jones Act claim. *Jauch v. Nautical Serv., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006), *citing Miles v. Melrose,* 882 F.2d 976, 984 (5th Cir. 1989). A seaman's comparative negligence will not, necessarily, bar his recovery, but might

8

act to reduce the amount of damages owed proportionate to his share of fault. *Id.* Comparative negligence applies in both Jones Act and unseaworthiness actions, barring an injured party from recovering for the damages sustained as a result of his own fault. *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989). The defendant, however, has the burden of proving that a seaman, such as Mr. Semien, was guilty of comparative negligence. The same causation standard applies to employer negligence and employee contributory negligence in FELA cases, and therefore extends to Jones Act cases.[3] *Sorrell*, 127 S.Ct. at 802.

Mr. Semien alleges Parker Drilling is liable for the following acts of negligence under the Jones Act:

1. Failing to provide functioning pumps to empty the trip tanks on the day of the accident;

2. Failing to provide the help requested by Mr. Semien to manually open the trip tanks by overhead valves (after the pumps were found to be inoperable);

3. Removing a permanent ladder that was part of the original design whose purpose was to allow a worker to access the overhead valves to manually empty the trip tanks without the need to use a portable ladder.

4. Failure to properly train employees in the use of portable ladders by requiring the securing of a portable ladder prior to use; and

5. Failure of the Parker Driller to call an All Stop when he knew that the trip tanks were filling up and the pumps normally used to empty these tanks were inoperable.

---

[3]"Enacted in 1920, the Jones Act, 46 U.S.C. §§ 30104–30105(b), makes applicable to seamen the substantive recovery provisions of the Federal Employers Liability Act (FELA), 45 U.S.C. § 51 et seq. , which became law in 1908." *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 129 S.Ct. 2561, 2576 (2009); *see also American Dredging Co. v. Miller*, 510 U.S. 443, 456 (1994)("[T]he Jones Act adopts the entire judicially developed doctrine of liability under the Federal Employers' Liability Act (FELA). . . ." (Internal quotation marks omitted)).

In response, Parker Drilling argues Mr. Semien was the sole cause of his injuries; Mr. Semien did not exercise reasonable care under the circumstances; and Parker Drilling exercised reasonable care under the circumstances.

### B.   Unseaworthiness

Mr. Semien is, also, asserting a claim for damages for a breach of the warranty of seaworthiness. A Jones Act seaman may sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness, regardless of whether the vessel is owned by his employer. *Becker v. Tidewater, Inc.,* 335 F.3d 376, 387 (5th Cir.2003). A shipowner has an absolute non-delegable duty to provide a seaworthy vessel. *Brister v. AWI, Inc.,* 946 F.2d 350, 355 (5th Cir.1991). Accordingly, the seaworthiness issue is treated more akin to a breach of warranty, rather than the narrower duty-breach inquiry for negligence. *Id., citing In re Cooper/T. Smith,* 929 F.2d 1073, 1077 (5th Cir.1991).

To prove a vessel is unseaworthy, a seaman, such as Mr. Semien,  must prove that the defendant provided a vessel (including its appurtenances, gear, and equipment) not reasonably fit for its intended purpose, *Phillips v. Western Co. of N. Am.,* 953 F.2d 923, 928 (5th Cir.1992). *See also, Courville v. Cardinal Wireline Specialties, Inc.,* 775 F.Supp. 929 (W.D. La. 1999) (failure to provide nonskid paint on stairs rendered vessel unseaworthy); *Brister v. A.W.I., Inc.,* 946 F.2d 350 (5th Cir. 1991) (mismatched rig mats on drilling floor rendered rig unseaworthy); *Blaauw v. Superior Offshore International, L.L.C.,* 2008 WL 4224808 (W.D. La. 2008) (presence of a bungee cord in a diving bell rendered vessel unseaworthy; and *Campbell v. Chet Morrison Contractors, L.L.C.,* 2012 WL 3028079 (W.D. La. 2012) (failure to provide needed air compressor rendered the vessel unseaworthy) and that the unseaworthy condition was the proximate cause of his injury. As noted, because the defendant's duty to provide a seaworthy vessel is completely independent of its duty to

exercise reasonable care, Mr. Semien does not have to prove the defendant was negligent to prevail on his unseaworthiness claim. However, Mr. Semien is required to meet the more demanding standard of proximate causation, rather than the lighter standard applicable under the Jones Act negligence claims (*i.e.*, the negligence must play any part, in whole on in part, in producing the injury). Consequently, Mr. Semien must establish that the "unseaworthy condition played a 'substantial part' in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the vessel's unseaworthiness." *Phillips,* 953 F.2d at 928.

A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, or her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. *Stowe v. Moran Towing Corp.*, 995 F.Supp.2d 570, 576 (E.D. La. 2014), *citing Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 91 S.Ct. 514, 517–18, 27 L.Ed.2d 562 (1971) (internal citations omitted); *see also Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977).

Mr. Semien, however focuses his claim of unseaworthiness on two particular aspects of the rig: the faulty trip tanks and pumps, which Mr. Semien argues forced him to work in an unsafe area and the absence of the permanent ladder with an anchor point to which a safety harness could have been attached, leaving a known and necessary work area without safe access. Mr. Semien argues both conditions made the rig unsafe for its intended purpose.

### C. Maintenance and Cure

Mr. Semien is, also, asserting a claim for maintenance and cure under the general maritime law. In *Meche v. Doucet*, 777 F.3d 237, 244 (5th Cir. 2015), the Fifth Circuit explained a seaman's

rights to maintenance and cure as follows: "Maintenance and cure is a contractual form of compensation afforded by the general maritime law to seamen who fall ill or are injured while in the service of a vessel." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir. 2006), *citing McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547, 548 (5th Cir.1968). "Maintenance is a daily stipend for living expenses," whereas "cure is the payment of medical expenses." *Lodrigue v. Delta Towing, L.L.C.*, 2003 WL 22999425, at *6 n.51 (E.D. La. Dec. 19, 2003), *citing Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1499 (5th Cir.1995), *abrogated on other grounds by Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 129 S.Ct. 2561, 174 L.Ed.2d 382 (2009).

The obligation to pay maintenance and cure is independent of tort law, and the shipowner's duty to pay is not affected by the injured seaman's own negligence. *Boudreaux v. U.S.*, 280 F.3d 461, 468 (5th Cir. 2002), *citing Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir.1994). Thus, the obligation to provide this compensation does not depend on any determination of fault, but rather, is treated as an implied term of the contract for maritime employment. A seaman may recover maintenance and cure even for injuries or illnesses pre-existing the seaman's employment unless that seaman knowingly or fraudulently concealed his condition from the vessel owner at the time he was employed. *Jauch*, 470 F.3d at 212, *citing McCorpen*, 396 F.2d at 548. Maintenance and cure must be paid by the seaman's employer until the point of "maximum medical recovery" or "maximum cure." *See Alario v. Offshore Service Vessels, LLC*, 477 Fed. Appx. 186 (5th Cir. 2012), *citing Vaughan v. Atkinson,* 369 U.S, 527, 531, 82 S.Ct. 997; *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979). Maximum cure is reached when a seaman's condition is of a permanent character and/or will not further improve with additional medical treatment. *Rashidi v. American President Lines*, 96 F.3d 124 (5th Cir. 1996); *Morales v. Garijack*, 829 F.2d 1355 (5th Cir.1987). Treatment intended to better a plaintiff's physical condition as opposed to only alleviating pain and

discomfort is considered curative. *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 476 (5th Cir. 2015). Treatment that does not improve the seaman's condition, but only works to alleviate pain is considered palliative. *Id.*

A seaman may bring a renewed claim for maintenance and cure even if thought to have reached maximum medical improvement if the medical condition changes so that further treatment would improve the claimant's condition. *Morales v. Garijak*, 892 F.2d 1355 (5th Cir. 1987); *Johnson v. Marlin Drilling Co.*, 893 F.2d 77 (5th Cir. 1990).

## VI.   <u>Remedies</u>[4]

In general, Mr. Semien alleges under the Jones Act recovery "... for personal injuries and damages of Complainant, KIRBY SEMIEN, as well as to recover for past and future lost wages, pain and suffering, both physical and mental, past and future medical expenses, maintenance and cure, and loss of society and services."

### A.   **Damage Elements Under the Law**

Under applicable law, past lost earnings are usually measured by the actual wage losses incurred by a seaman, such as Mr. Semien, from the date of the accident to the date of trial. Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.1 (4th ed.2004); followed in *Johnson v. Cenac Towing, Inc.,* 468 F.Supp.2d 815, 834 (E.D. La.2006).

The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983). In the *Culver* series of cases, the Court

---

[4] At the pretrial conference, the defendant agreed that, in general the type of remedies sought by Mr. Semien are legally available, but disagreed Mr. Semien would be entitled to his remedies under the facts of this matter. Under the general maritime law, generally, and in this case, Mr. Semien is entitled to claim the same basic elements of damages for unseaworthiness as he is allowed to seek under the Jones Act, with certain notable exceptions that are not present in this case. *See as applied in, Nichols v. Weeks Marine, Inc.*, 513 F.Supp. 2d 627 (E.D. La. 2007); *Simmons v. Transocean Offshore Deepwater Drilling, Inc.*, 551 F. Supp. 2d 471, 477 (E.D. La. 2008).

set forth a four-step process for determining lost wages:  (1) estimate the loss of work life or expected remaining work-life; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value. *Culver*, 722 F.2d at 117.   Thomas J. Schoenbaum, Admiralty and Maritime Law, §5-15.2 (4th ed.2004).  With the exception of monetary awards for future pain and suffering, future losses (income and medical expenses) must be discounted to present value. *Culver v. Slater Boat Co.*, 722, F.2d 114, 117 (5th Cir. 1983); Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.1, 2 and 3 and 6-18.2 and 3 (4th ed.2004); *see also O'Byrne v. St. Louis Southwestern Ry. Co.*, 632 F.2d 1285, 1286 (5th Cir. 1980).  Future loss of income, must, also, reflect a judgment to net, after tax, value. *Id; Norfolk &W. Ry. v. Liepelt*, 444 U.S. 490, 493-494, 100 S.Ct. 755, 757-758 (1980).

Damages for lost earnings are not, necessarily limited to lost wages alone; rather, if factually supported, a claim for lost earning capacity can be allowed.[5]

Under the applicable law, a damage award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on a seaman, such as Mr. Semien, and his ability to engage in those activities which normally contribute to the enjoyment of life. Thomas J. Schoenbaum, Admiralty and Maritime Law, §5-15.3 and 6-18.4 (4th ed.2004).  These types of damages are not subject to precise measurement. *Id.*  Any amount to be awarded for physical and mental pain and suffering depends to a great extent on the trial court's observation of Mr. Semien and its subjective determination of a reasonable amount needed to achieve full compensation.  *Hyde v. Chevron U.S.A., Inc.* 697 F.2d 614, 632 (5th Cir. 1983).  An award for physical and mental pain and suffering, also, depends on the facts of the particular case.

---

[5] *See: Downie v. U.S. Lines Co.*, 359 F.2d 344, 347 (3d Cir. 1966) *cert. denied* 385 U.S. 897, 87 S.Ct. 201, 17 L. Ed. 2d 130 (1966).

*Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 364-365 (5th Cir. 1980) *citing Wiley v. Stensaker Schiffahrtsges*, 557 F.2d 1168, 1172 (5th Cir. 1977) and *Fruit Indus., Inc. v. Petty*, 268 F.2d 391, 395 (5th Cir. 1959), *overruled on other grounds, Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 1997 A.M.C. 1521 (5th Cir. 1997). Thomas J. Schoenbaum, Admiralty and Maritime Law, §5-15.3 and 6-18.4 (4th ed.2004).

Generally, under the Jones Act, the recovery of prejudgment interest is not permitted. *Theriot v. J. Ray McDermott*, 742 F.2d 877 (5th Cir. 1984). The parties agree, however, the same rule does not apply to Jones Act cases brought under the court's admiralty jurisdiction, tried without a jury. When the court's admiralty jurisdiction is invoked under the Federal Rules of Civil Procedure 9(h); when a Jones Act case is brought under the court's admiralty side, and the case is tried to the court and not to a jury, an allowance of prejudgment interest is within the discretion of the trial court. *Williams v. Reading and Bates Drilling Co.,* 750 F.2d 487 (5th Cir. 1985); and as followed in *Doucet v. Wheless Drilling*, 467 F.2d 336 (5th Cir. 1972); *Bush v. Diamond Offshore Co.*, 46 F.Supp. 2d 515, 523 (E.D. La. 1999); and *In re Parish of Plaquemines as Owner of M/V Pointe-A-La-Hache*, 231 F.Supp. 2d 506 (E.D. La. 2002).

Under his maintenance and cure claim, Mr. Semien is seeking maintenance benefits in the amount of $35 per day be paid from the date maintenance was terminated (May 15, 2014) until maximum medical cure is reached – which he argues, has not yet occurred. Mr. Semien is, also, seeking Parker Drilling to pay for additional medical treatment, in particular, treatment provided by and recommended by Dr. David Clause under Parker Drilling's cure obligation. Mr. Semien argues the care provided by Dr. Clause is not merely palliative, and, that a recommended arthoscopic procedure is a necessary diagnostic measure required to determine if additional curative treatment is due and that additional maintenance and cure is owed - Parker Drilling disagrees and argues Mr.

Semien reached MMI on May 15, 2014 and any additional medical care is either palliative or too speculative to be warranted and, therefore, no additional maintenance or cure is due.

## VII.   **Findings**

After due consideration of the facts and evidence presented by the parties at trial by way of live witnesses, exhibits, and deposition testimony, and after having had the opportunity to assess the demeanor of the witnesses, and review and weigh the evidence, this Court makes the following findings:

### A.    **Mr. Semien was a Jones Act seaman**

Mr. Semien put forth sufficient evidence establishing that he is, in fact, a Jones Act seaman, and there was no evidence to the contrary presented by Parker Drilling.  Accordingly, this Court finds  Mr. Semien is a Jones Act seaman.

### B.    **Unseaworthiness**

There is no dispute Rig 34B is for purposes of the general maritime law, a vessel under that law.  To prove this vessel is unseaworthy, Mr. Semien must show: (1) the vessel, equipment, or crew were not reasonably fit and safe for the purposes required (*i.e.*, an unseaworthy condition); (2) the unseaworthiness actually caused or played *a substantial role in causing injury*; and (3) the injury was 'the direct result *or reasonably probable consequence* of that unseaworthiness. *Phillips v. Western Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir.1992). (emphasis added)

As noted earlier, Mr. Semien focuses his claim of unseaworthiness on two particular aspects of the rig: the faulty pumps and trip tanks, which Mr. Semien argues required him to work in an elevated area with no regular or otherwise safe access.  Thus, the faulty pumps and tanks and the absence of safe access to an elevated work area are his primary focus.   After hearing the evidence at trial, this Court concludes the failure of the pumps to operate and the trip tanks to *automatically*

drain would not *necessarily,* in and of themselves, have created an unseaworthy condition, as there was a way to manually drain the tanks.  However, there was no longer rig access available to the manual valves required to drain the tanks - the permanent ladder with the permanent safety harness attachment and run having been removed and not replaced by Parker Drilling.  Testimony was presented, while *not a usual occurrence*, it was *not necessarily unusual* to have to use the manual valves to drain the tanks and that the tanks could be drained in that fashion.   However, in this instance, the vessel owner had removed the only rig access to that part of the working system, the manual valves, and had not replaced that access.  It is undisputed that Rig 54B at one time had a permanent ladder system providing safe access to the manual valves that included an anchor point system to which a harness could be attached and run along with the employee as he or she climbed, manipulated the manual valve, and descended.  This ladder system provided safe access to the manual valve work area which was located 13'8" above the bottom deck.  Steve Villejoin, the Parker Drilling toolpusher/rig manager, testified he was aware that RIG 54B had previously had a permanent ladder on the bottom deck below the manual trip tank valves.  Villejoin, also, testified this ladder was used to access the manual trip tank valves, but was removed during refurbishing in 2006, and was not replaced; he did not indicate why it was removed or why it was not replaced.  Thus, although the vessel had a backup system allowing manual draining of the trip tanks if the pumps failed - as they did in this instance - the vessel had no access to these valves, thus, that area of the vessel became unfit for its intended use once the rig access was removed by the vessel owner and not replaced with a safe substitute.  Therefore, this Court finds the vessel was unseaworthy in that regard.

However, the mere existence of an unseaworthy condition, again, does not, necessarily, end the inquiry.  As explained above, the seaman must, also, establish that the unseaworthy condition

was *the proximate cause* of his injury. After having heard all the testimony, this Court concludes removal of the permanent ladder system – while it might have created an unseaworthy condition, was not, however, the proximate cause of Mr. Semien's injury. As noted above, Mr. Semien is required to meet the more demanding standard of proximate causation when alleging unseaworthiness. In other words, Mr. Semien must show the "unseaworthy condition played a 'substantial part' in bringing about or actually causing the injury and that the injury was *either a direct result or a reasonably probable consequence* of the vessel's unseaworthiness." *Phillips,* 953 F.2d at 928. (emphasis added) Here, this Court finds the removal of the permanent ladder system and failing to replace that system with a safe substitute, creating a work area some 13'8" above the work area without safe rig access did create an unseaworthy condition; however, this Court finds the unseaworthy condition was not *the proximate cause* of Mr. Semien's injury, as the condition, in and of itself did not play a "substantial part" in causing Mr. Semien's injury. Rather, this Court finds Parker Drilling's *negligence,* paired with Mr. Semien's *negligence,* acted in concert to cause Mr. Semien's accident and injury, as will be explained below.

Based on the foregoing, this Court concludes that although the removal of the permanent ladder system without replacing the system with safe rig access to the manual valve created an unseaworthy condition on board the vessel, nevertheless, Mr. Semien has not established that this unseaworthy condition was the *proximate cause* of his accident and injury.

## C.   Negligence

In general, as noted above, Jones Act negligence on the part of the employer may arise in many different ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the work place, failure to inspect the work place for hazards, failure to take precautions to protect a seaman, or any other breach of the

18

duty of care. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir. 1977), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997); Thomas J. Schoenbaum, Admiralty and Maritime Law, §6-21 (4th ed.2004). The duty of care owed by a Jones Act employer is that of ordinary prudence, namely, the duty to take reasonable care under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338-39 (5th Cir. 1997). However, the standard for causation in a Jones Act case is light: it is plaintiff's burden to show, by a preponderance of the evidence, that the employer's negligence was the cause, in whole or in part, of plaintiff's injuries. *Derouen v. Vaughn Marine, Inc.*, 529 F.2d 1222, 1225 (5th Cir. 1976); *see also CSX Transp., Inc. V. McBride*, 131 S.Ct. 2630, 2636 (U.S. 2011). "[T]he standard is one of 'producing cause' rather than 'proximate cause' and . . . the burden of proof is 'featherweight.' Thus, two concepts come into play here-the type of causation that must be shown (producing) and the plaintiff's burden to show that cause (featherweight)." *Clark v. Kellogg Brown & Root L.L.C.*, 414 Fed.Appx. 623, 626 (5th Cir. 2011)(*citing Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60, 62 (5th Cir.1982)).

A seaman, however, is, also, obligated under the Jones Act to act with ordinary prudence under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997). Comparative negligence may apply to reduce a seaman's recovery on a Jones Act claim. *Jauch v. Nautical Serv., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006), *citing Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989), *see also Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008) (*citing* 45 U.S.C. § 53; *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 127 S.Ct. 799, 802 (2007)). Whereas, the plaintiff bears the burden of proving the defendant's fault, the defendant bears the burden of proving the plaintiff is comparatively at fault. *See Sorrell*, 127 S.Ct. at 807.

Mr. Semien alleges negligence on the part of Parker Drilling in multiple respects. As noted,

19

Mr. Semien alleges injury occurred while he was attempting to physically manipulate a manual "dump valve" located 13'8" above the work area floor, with no rig access to those valves. On Rig 54B, the work area including the set of manual valves that were part of the trip tank system, was integral to the operation of the rig, as the manual valves supported the tanks' operation when the automatic pumps were not working. This work area was located approximately 13'8" feet above the rig floor work area and had no rig access. Again, as noted earlier, Rig 54B had, at one time, a permanent ladder by which workers could access that specific elevated work area, however, Parker Drilling had removed the permanent ladder, not replaced it nor created a safe physical substitute, and thereby, had left a known, and necessary, work area some 13'8" above the floor with no rig access. At that point, *Parker Drilling had knowledge of an unsafe workplace and dangerous condition aboard its rig, of its making,* and therefore, had the obligation to take precautions to protect someone such as Mr. Semien whose job required him to work in that area. In other words, at the point Parker Drilling created an unsafe workplace and dangerous condition on its rig, Parker Drilling had an obligation to either replace the ladder with a safe physical structure by which employees could safely access the manual valves, or to take precautions to allow safe access to the manual valves. It is undisputed Parker Drilling did not replace the ladder or put another physical structure in place to allow rig access. Parker Drilling, however, argues it did take precautions to protect its employees as it had certain existing general safety standards – which, if followed or if cobbled together – Parker Drilling argues would suffice to provide a system, process, or policy or policies to allow safe access to the manual valves. However, the testimony at trial establishes that, at each stage, the argued Parker Drilling "system" or policies failed.

Despite having removed and not replaced the only means of rig access to the manual valves, Parker Drilling created no Job Safety Analysis delineating the proper manner to safely access the

known, elevated, work site, which, again, was located approximately 13'8" above the rig floor, *despite having full notice that the only safe means of ingress or access to an integral part of the rig had been removed by them and not replaced*. Thus, Parker Drilling removed the only rig access to the known and necessary work area, creating a necessary work area with no rig access, and Parker Drilling, also, failed to take adequate precautions to protect their employees who had to work in that area. Parker Drilling *had notice* the manual valves were part of the trip tank system; Parker Drilling *had notice* that employees had to access and manipulate those manual valves when the automatic system failed; Parker Drilling *had notice* they had removed the rig access to that area; Parker Drilling *had notice* no physical replacement was established; Parker Drilling *had notice* they had created an unsafe work area and dangerous condition; and Parker Drilling *had notice* they had not created a formal process or system addressing this situation, notwithstanding *full knowledge* the rig now had a known and necessary work site some 13 plus feet above the rig floor with no rig access.

Parker Drilling argues, however, that its already existing generalized safety policies, individually, and when cobbled together, should suffice. This Court disagrees. The evidence established  Parker Drilling had created Job Safety Analyzes for other situations, but chose not to do so for this situation, one of their own making.  And, perhaps more importantly, each of the generalized safety policies argued by Parker Drilling *failed in actual application*, whether from a lack of training of the Parker Drilling's employees, or by way of the inherent ambiguities within the policies themselves, or by way of the ambiguities created when those general policies were attempted to be cobbled together or applied to a specific task. Of course, each task to be done aboard a working rig does not necessitate a formal Job Safety Analysis, however, here, Parker Drilling, *itself, created an unsafe work area and dangerous condition* when they removed the only rig access to a known, elevated, and necessary work area.  At that point, Parker Driller had an obligation to provide a safe

21

substitute for access, or to take precautions to protect their employees who would have to work in that unsafe work space.

Again, even in the absence of a formal Job Safety Analysis addressing the hazard Parker Drilling had created, had the generalized safety policies already in place, in fact, acted as a safe substitute, or an adequate precaution, as Parker Drilling argues, perhaps, Parker Drilling's argument would be more persuasive. However, as noted, and as will be explained below, each of the prongs of this argued impromptu process failed in specific application.

There are three primary, general, safety policies Parker Drilling argues that, individually and particularly when brought together, should act as a safe substitute for the rig access Parker Drilling removed or as adequate precaution. Parker Drilling argues, first and, perhaps, foremost, its "buddy system", itself, if followed, would have eliminated the risk and unsafe condition. Parker Drilling, also, argues Mr. Semien should not have used an extension ladder to access the 13'8" elevated work area; and Parker Drilling, argues Parker Drilling's safety policy addressing the use of safety harnesses, again, would have prevented Mr. Semien's accident. And, finally, Parker Drilling argues, when pulled together, these policies, as a collective, create a whole that, also, would have provided a safe manner of access to the known, elevated work area and constitute sufficient precautions. For the reasons noted below, this Court disagrees.

Parker Drilling, first, argues the plaintiff should have used the "buddy system" and had he done so, the accident would not have occurred. However, the testimony establishes Mr. Semien did attempt to use the actual system Parker Drilling instructed him to employ; however, Parker Drilling's employees failed to honor their role in that system. Mr. Semien did as he was trained and called his supervisor - Mr. Landry the driller - and explained that the pumps were not working and that the tank would have to be emptied by way of the manual "dump" valve. Landry instructed Semien to call the

crane operator - Palfrey and to have Palfrey and his helper come and dump the tank. Mr. Semien, thereafter, did as instructed, called Palfrey, and Palfrey told him he would come as soon as he completed filling out a permit, in about 10 minutes. Plaintiff's Exhibit 16, p. 11, para. 6; p. 17. Palfrey, however, did not come in 10 minutes; Palfrey did not come in 45 minutes; and in fact, testimony established *Palfrey never came to provide the requested help.* Indeed, when Palfrey found Mr. Semien lying injured on the rig floor, some 45 minutes after Mr. Semien had asked for help, Palfrey was not coming to provide the requested help, rather he was in search of a tool he needed for another job. Clearly, up to that point, *Semien had done as instructed and trained; Palfrey did not.* When Palfrey did not come as promised, Mr. Semien testified he, again, called Palfrey to no avail, and, again, called his supervisor, Mr. Landry. Although neither Palfrey nor Landry remembers, one way or the other, whether Mr. Semien called a second time, this Court finds for reasons noted and to follow, that Mr. Semien called the driller twice; and called Palfrey twice; requesting help. On the second call to the driller, this Court finds Mr. Semien told the driller that he, Mr. Semien, was going down to the rig floor above which the manual valves were located and the driller told him "to be safe." Although the driller could not recall one way or the other whether Mr. Semien called a second time, this Court finds Mr. Semien's testimony on this point credible as Mr. Semien would have been leaving his duty station and his assigned task of monitoring and communicating the tank levels to the driller and, therefore, had he left, he would not have been able to report to the driller the return into the trip tanks as he had been assigned. Thus, this Court finds it reasonable to accept that Mr. Semien did call the driller, the second time, before he went down. Thereafter, Mr. Semien went down to make the necessary preparations for Palfrey and Palfrey's helper to dump the tank, and waited; Palfrey, still, did not come. As noted, Mr. Semien testified he called Palfrey again, however, to no avail. This Court finds Mr. Semien credible on this point as

testimony established Palfrey was, by this time, on the other job in either the pump room or the mud room.   Thus, this Court finds, up to this point, Semien followed his training and instruction, requested help multiple times, and help, although promised, never arrived; that is Parker Drilling's failure – not Mr. Semien's.

This Court finds the testimony was clear that Mr. Semien followed Parker Drilling's policy by calling, first, the driller, Fred Landry, for help, who told Mr. Semien to call the crane operator, Palfrey, and then calling Palfrey.   Mr. Semien called Palfrey and requested help; Palfrey told him he would come as soon as he completed the permit, in about 10 minutes.[6]  Mr. Semien testified he, thereafter, waited about 15-20 minutes for Palfrey to arrive, but Palfrey did not come.  When Palfrey did not arrive to help, as noted above, Mr. Semien testified he called Palfrey again, but got no answer.  Again, as noted, Mr. Semien testified he, then, again, called the driller and told the driller that he was "going down" and the driller told him "to be safe."  Again, although, the driller testified he does not recall one way or the other whether Mr. Semien called him a second time, this Court finds Mr. Semien's testimony that he called the driller a second time credible, because, again, Mr. Semien and Landry were in close contact during the process at play on the drill floor as Semien was monitoring the return level in the tanks and providing that information to the driller because the hole had previously been losing liquid into the formation.  Therefore, it is reasonable to assume Mr. Semien would have needed Landry's permission to leave his post -- where he was monitoring the water levels in the tanks – to go to the bottom deck.

Mr. Semien testified that, once on the bottom deck, he began preparing the area for Palfrey

---

[6]Although there is a discrepancy between Palfrey's deposition and trial testimony concerning whether he told Mr. Semien he would be there to help after filling out a work permit, Steve Villejoin, who was in the room with Palfrey at the time Palfrey spoke to Mr. Semien, testified Palfrey was filling out a work permit when he got the call from Mr. Semien.  This testimony is corroborated by Parker Drilling's post-accident investigation report, which contains the claim that Palfrey told Semien he would be there in 10 minutes.  Plaintiff's Exhibit 16, p. 11, para. 6; p. 17.

and his helper, still expecting Palfrey and his helper to arrive to help. Semien located and donned a life vest, hooked his "elephant hose," and went down to the barge. He obtained a ladder and put it in place, and looked up through the floor opening to check the trip tank gauge level once again - and Palfrey and his helper still had not come. When Palfrey did not arrive and could not be reached, Mr. Semien testified he believed he was running out of time as the second tank was fast filling and at that point he was faced with a "the devils own choice" - to continue to wait for Palfrey and risk the undesirable consequence of an overflow or of the water in the tanks backing into the oil based mud pits and thus, failing in his job responsibility to handle and regulate the tanks, or to attempt the task of dumping the tank himself. Mr. Semien made the decision to manually open the valve himself.

Steve Villejoin, the toolpusher, confirmed that at the time Mr. Semien called Palfrey, and requested the help, Villejoin and Palfrey were intending to perform maintenance in the mud room or the pump room, work that required a lockout permit. Palfrey was filling out that permit in the toolpusher, Villejoin's office when Mr. Semien called.[7] After Palfrey talked to Mr. Semien, Palfrey continued working on the permit, which takes about 10 minutes, and, thereafter, Palfrey *and Villejoin* went to the job in the mud or pump room, which Villejoin's testimony estimated would have taken another 30 minutes.[8] Palfrey did not go to help Mr. Semien as requested and promised and the

---

[7]*See*: testimony of Steve Villejoin, cross-examination by Mr. Ryan, Trial Day 1, March 7, 2016. Villejoin testified after Palfrey completed the permit, he and Palfrey went to work in the mud room to clean a screen on a mud pump and his best estimate of the rough amount of time that he and Palfrey worked together there was 30 minutes. Although Villejoin testified he wasn't certain Palfrey had told him exactly what Mr. Semien had said, as explained above, this Court found that testimony questionable, and for the reasons given, has found Mr. Semien told Palfrey why he was calling.

[8] There are multiple validations in the testimony that the permit was involved, *e.g.*, Landry heard that Palfrey was filling out the permit, and Villejoin testified that Palfrey was filling out a permit. Villejoin testified the permit took 5 to 10 minutes to fill out and Parker Drilling's investigative report also reflects the 10 minute period. Plaintiff's Exhibit 16, p. 11, para. 6; p. 17. *See:* also, testimony of Steve Villejoin, cross-examination by Mr. Ryan, Trial Day 1, March 7, 2016.

toolpusher, Villejoin, did not ensure the requested help was supplied. Rather, after Mr. Semien's call, Palfrey and Villejoin left the toolpusher's office and went to either the mud or pump room to work on another job. At some later point, Palfrey left the mud or pump room to obtain a specific tool he needed for that job; it was only then Palfrey discovered Mr. Semien lying on the floor, by sheer happenstance. Mr. Palfrey never came to provide the requested and promised help and Villejoin did nothing to ensure the requested and promised help was, in fact, supplied.

Although Parker Drilling argues their "buddy system" could have prevented this accident, such argument rings hollow when Parker Drilling's employees flagrantly failed to provide the help Mr. Semien requested, even though they assured Mr. Semien they would. Villejoin testified that, at most, 45 minutes passed between the time Mr. Semien called, and spoke to Palfrey, and the time Palfrey discovered Mr. Semien; the evidence established Palfrey told Mr. Semien he would be there in 10 minutes; Palfrey's testimony verified *he never went to help* Mr. Semien. Villejoin, also, confirmed that trip tanks can overflow – first into the sand traps and then the mud pit, and thereafter, conceivably, into the water – which can create an environmental spill or the contents of the trip tank can back up into the mud pits creating undesirable consequences. Although Villejoin felt these unlikely scenarios, he agreed undesirable circumstances could ensue if the trip tanks backed up or overflowed, as Mr. Semien testified he feared, and, yet, Villejoin and Palfrey left Villejoin's office after Mr. Semien's call, not to help Mr. Semien as had been promised, but to work in the mud or pump room. Testimony established that avoiding the possible undesirable consequences relating to the trip tanks was part of Mr. Semien's job responsibility and that he, Mr. Semien, had asked for help as instructed, was promised help, and, yet, no help was provided either as promised, or indeed, ever. Mr. Semien was attempting to do his job as trained and instructed; Parker Drilling employees were not and did not. Mr. Semien honored his role in the "buddy system" by requesting help; the Parker

26

Drilling employees failed to honor their role in argued "buddy system," entirely by not providing that help as promised or within a reasonable time and manner.

The testimony, also, made clear that the toolpusher knew Mr. Semien had called Palfrey for help, and that help had been promised in 10 minutes, however, when Palfrey left the toolpusher's office, *the toolpusher went with Palfrey to the mud or pump room to work, and not to provide the promised help.*[9] At one point, thereafter, Villejoin testified, Palfrey left the mud or pump room, and he, Villejoin, was not sure if Palfrey was going to help Mr. Semien or to find a tool for the other job. *Indeed, the testimony, however, establishes Palfrey was not going to help Semien, indeed, Palfrey never did go to help Mr. Semien, rather Palfrey was still engaged in the other job when he happened upon Semien some 45 minutes later.* Palfrey testified that when, he, Palfrey, found the injured plaintiff, he was looking for a specific tool for the other job and had not come to help with the manual valves as he had promised. Thus, although Parker Drilling argues the plaintiff failed to properly utilize their "buddy system," in this instance, this Court finds it was Parker Drilling's employees who failed to properly utilize the argued "buddy system." The Court finds Parker Drilling employees *failed to implement its "buddy system."* Mr Semien called and asked for help; Palfrey told Mr. Semien he would come after completing the permit - in some 10 minutes; Palfrey did not come; the toolpusher Villejoin knew all of this; Mr. Semien called Palfrey again, there was no answer; Mr. Semien called his driller again, and yet, *help never came.* Whether Parker Drilling did not train its employees as to the importance of and how to implement their "buddy system," or whether Parker Drilling's employees, Palfrey and Villejoin, simply disregarded that possible training is of no real moment. Either way, Parker Drilling's "buddy system" failed because *Parker Drilling's employees failed to respond at all*, through no fault of Mr. Semien.

---

[9]*See:* Testimony of Steve Villejoin, cross-examination by Mr. Ryan, Trial Day 1, March 7, 2016.

Parker Drilling argues, however, that Mr. Semien should have "gotten" help rather than just "request" help. However, again this Court disagrees. The facts establish Mr. Semien requested the help, was promised help, and tried to reach the "buddy" yet again when the promised help did not come and that the he told his immediate supervisor, Mr. Landry, that we was going below. Parker Drilling's employees, Palfrey and Villejoin, for whatever reason - and no credible evidence as to a reason was given - did not play their required roles required for a meaningful "buddy system" to operate - Palfrey to actually provide the help; Villejoin, as toolpusher, to see that the request for help was, in fact, honored. Indeed, Mr. Landry, the driller, testified he expected help would have been forthcoming quickly.[10] And yet, some 45 minutes after the request and promise of help in 10 minutes, the promised helper was still engaged in another ongoing job and at no time before Mr. Semien's accident was help ever sent - thus, this Court finds a clear failure of Parker Drilling's "buddy system," through its employees, Palfrey, and Villejoin.

Yet, Parker Drilling argues Mr. Semien should, nonetheless, have continued to wait. Mr. Semien argues when the promised help did not come, and when he could not reach Mr. Palfrey to find out why, and as the gauge reflected the second tank was fast filling to capacity, he was faced with the devil's own choice between possibly failing at his job responsibilities or acting alone - neither choice ideal. Had Parker Drilling's "buddy system" operated properly, *as argued by Parker Drilling* - and this Court finds it did not - perhaps, Mr. Semien would have been spared the devil's choice - and perhaps, as Parker Drilling argues, Mr. Semien's accident might never have happened. However, under these facts, Parker Drilling's "buddy system" clearly failed. One cannot argue one has an exonerating safety policy when in reality that policy is not honored by the company and its employees; this failure rests with Parker Drilling.

---

[10]*See*: Testimony of Fred Landry, cross-examination by Mr. Ryan, Trial Day 1, March 7, 2016.

Parker, also, argues the plaintiff should have used an A-frame, rather than an extension ladder to access the manual valves; the A-frame being sturdier than an extension ladder. Parker Drilling, also, argues, had Mr. Semien done so, his accident might not have occurred. However, there was much conflict in the testimony concerning whether such a policy actually existed and/or whether employees knew of the existence of any such policy, and whether, it, too, was not honored by Parker Drilling's employees. Conflicting testimony was presented on whether Parker Drilling employees had used A-frame or extension ladders in the past to do this task, evidencing, at least, a lack of training on the part of employees as to the argued, alleged, safety policy. Indeed, Mr. Palfrey testified he had seen Mr. Semien use an extension ladder to do the same task before, and that he, Palfrey, had seen other hands using an extension ladder but, because of his personal preference, he always suggested they use an A-frame. Thus, testimony established extension ladders were used. Regardless, however, Mr. Semien testified that when he went to look for a ladder *in the bin area where ladders and other similar equipment were to be kept on this deck* – which, incidentally is a deck approximately the size of two to three courtrooms – he could find only the extension ladder he used. Therefore, if Parker Drilling argues the plaintiff should have used only a specific ladder for this specific job, it would seem reasonable to assume Parker Drilling Employees, such as the plaintiff, should have been properly trained to use such a ladder, *and it would seem reasonable that the required type of ladder should have been readily available.* None of which this Court finds was the case. Again, this Court finds the evidence established a failure of this prong of Parker Drilling's "system" or argued safety policies.

Finally, Parker Drilling argues the plaintiff should have used a safety harness before climbing the ladder. Here, the testimony clearly established that all employees were, in fact, trained in Parker Drilling's policy that when working at heights over 6 feet on a ladder, employees were required to

29

use a safety harness or some other form of fall protection. The testimony established the employees, including Mr. Semien, had been trained in this policy. However, the testimony, also, shows that harnesses were not necessarily available on the bottom deck near the manual valve work area. There was testimony that while harnesses could possibly have been found on that deck, the testimony was that harnesses were ordinarily kept on the deck above. Again, as Parker Drilling knew it had a work area 13'8" above the deck with no rig access, it would seem reasonable to routinely store fall protection on that deck in the designated area.

Mr. Semien testified, however, that he did not feel he had time to get a safety harness; however, Mr. Semien testified he had time to get a life jacket and put it on, get the "elephant hose", go to the barge, find and place the ladder, and to, again, check the tank valve. Mr. Semien, also, knew a harness would be required *for whomever climbed the ladder* and, yet, when setting up for Palfrey and his helper, Mr. Semien did not go get any kind of fall protection. This failure rests squarely with Mr. Semien.

However, this Court notes, within the impromptu "system" Parker Drilling argues as its safe substitute or as precautions implemented for the removed ladder and harness line and anchor, there is no replacement anchor site to which fall protection can be attached, at all, and certainly none available while one is on the ladder well above 6' attempting to attach fall protection. Rather, Mr. Villejoin testified, an employee would have to climb the approximately 14' ladder, and while perched on the ladder some 12-13 feet in the air, reach behind one's back to grasp a harness or lanyard attached there, and then, again, all the while perched on a 14' or higher ladder, locate and grasp the harness or lanyard behind one's back and once grasped, throw it over an existing pipe even with or above one's head, which, might, or might not, hold one's weight if one fell. There is no evidence the suggested pipe met Parker Drilling's own safety policy, which Mr. Villejoin testified required

anchors to have a strength sufficient to handle a static 5,000 pound load and there was not evidence of any anchor point for fall protection to protect while one is above 6', on a ladder, *attempting to attach fall protection.*[11]   Therefore, it should not go without notice that there is grave question whether Parker Drilling's argued system (literally, throwing a harness or lanyard dangling from one's back, over a pipe even or above one's head to create fall protection, while perched on a ladder some 14 feet in the air with no fall protection) would actually meet Parker Drilling's obligation to provide a safe place to work or would have prevented Mr. Semien's accident.  However, there is no dispute in this instance, Mr. Semien wore no harness at all.  However, the foregoing, further, illustrates the inherent weakness of the cobbled-together "system" and policies Parker Drilling argues it put in place to protect its employees from the unsafe work place and dangerous condition it had, itself, created, and, significantly weakens its argument that had Mr. Semien used fall protection, his accident would not have happened.  Parker Drilling removed the rig access and anchor point; the procedure it now argues should be employed, leaves the employee perched some 12-13 feet in the air on a ladder attempting to accomplish anchor for fall protection – leaving the employee with no fall protection while on the ladder and while attempting to throw the harness or lanyard hanging from their back, over a pipe, even with or above one's head.  Nonetheless, as to causation, one must remember Mr. Semien chose, for whatever reason, not to wear a harness or fall protection at all.

This Court finds the testimony shows that, up to the point Mr. Semien decided to go forward to dump the tanks, *in the manner he chose*, he had followed, or had attempted to follow, Parker Drilling's argued "system" and policies for performing his assigned work, but at each level, Parker

---

[11] Parker Drilling's safety standards required that safety harnesses be attached to structures that could withstand 5,000 lbs. of static force.  There was no testimony that the pipe located near the manual valves, to which Parker Drilling suggests the plaintiff should have thrown his lanyard or harness over, could have withstood such weight.

Drilling's system or argued safety policies failed, through no fault of Mr. Semien. However, at the point Mr. Semien chose to go forward *in the fashion chosen*, Mr. Semien's's own conduct, also, became a moving force in causing his accident. This Court finds Mr. Semien acted in concert with Parker Drilling, each causing, "... in part" his accident. Specifically, when Mr. Semien chose to prop an extension ladder, against a round manhole cover, on a wet deck, climb that ladder alone, with no fall protection, if possible, and attempt to physically manipulate a valve which required one to physically move the valve outside of a notch and jerk it open, Mr. Semien, at that point, became an active participant in bringing about his own accident and injury, along with Parker Drilling.

Again, Mr. Semien argues he did not have time to get a harness and suggests that even with a harness his accident might not have been avoided. This Court finds the latter more persuasive than the former. The Court finds Mr. Semien had time to get a life jacket and don it, and to perform the other tasks noted. Mr Semien clearly had time to locate and don a life vest, and to do the other preparatory work he explained, and, yet, he chose to omit a Parker Drilling safety policy arguably designed for his individual safety. Mr. Semien should have honored those policies which were designed for his safety, if possible, just as Parker Drilling should have honored its obligation to provide safe access or meaningful precautions – neither did.

This Court will never know if help would have ever actually have been provided; however, it is equally unknown to this Court whether the tanks actually would have overflown had the plaintiff waited some indeterminate longer time before doing the task himself. The testimony shows the plaintiff lay on the deck for a period of time after he fell, and the tanks did not overflow during that time period; however, the testimony, also, shows the driller left the drill floor once he was told Mr. Semien had been found. Mr. Landry testified there was no relief driller, therefore, it is reasonable to assume that the operation causing the flow into the tanks would have stopped when Mr. Landry

32

left the drill floor. Quite simply, the Court will never know whether the tanks would have overflown had the plaintiff waited longer for help to arrive, just as this Court will never know if help would have ever arrived as requested and promised. This Court, however, finds that Palfrey's failure to come as promised, or within a reasonable period of time, or as is the case here, his failure to ever come - as was the case - is a failure on Parker Drilling's part to provide the necessary help. This Court further finds this failure is Parker Drilling's failure to honor its own argued "buddy system." For a "buddy system" to operate, when help is requested, help must be provided, or at least, be provided within a reasonable time, or as promised. Otherwise, Parker Drilling's failure places its employees, such as Mr. Semien, in the untenable position of having to risk failing in his or her job responsibility or having to risk doing the necessary task alone, again, a "devil's own choice," the cause of which rests squarely at the feet of Parker Drilling.

Parker Drilling, nonetheless, argues it can have no liability for negligence because it did not have notice the plaintiff intended to do the job by himself, without a buddy, and without a safety harness. Also, Parker Drilling argues Fred Landry instructed Mr. Semien to get help – not ask for help – and therefore, Mr. Semien was expected to wait for however long it might have taken for help to arrive, notwithstanding the agreed upon possible, resultant, undesirable consequences. This Court finds application of this time honored precept of the law to these facts to be a misstatement of issue. Here, *Parker Drilling had notice of the unsafe work area and dangerous condition – they had created it. Parker Drilling knew it had removed the only rig access to a known, necessary, work area some 13 feet above the rig floor, clearly creating an unsafe work area or dangerous condition.* Once Parker Drilling had removed the safe rig access, *Parker Drilling knew and had notice that it had created an unsafe work area and dangerous condition, i.e.,* a known work area 13'-14' above the rig floor with no available rig access. Thus, Parker Drilling *knew there was a need* to create a

safe substitute to provide a means of access to this known and integral work area and *knew there was the need to take precautions to protect its employees, such as Mr. Semien, who would have to work in that unsafe area.* Nonetheless, Parker Drilling did not create a physical substitute; Parker Drilling did not create a Job Safety Analysis to address this unsafe condition of their own making; Parker Drilling did not adequately train their employees to any substitute process; and this Court finds Parker Drilling did not sufficiently train their employees, such as Villejoin and Palfrey, to follow even the existing policies they today argue and rely upon. Mr. Semien called for help; Palfrey never came *and the tool pusher knew help had been requested, had been promised in 10 minutes, but made no effort to ensure it was provided in 10 minutes, or at all.* Rather, to the contrary, the toolpusher left with Palfrey to do another job that would take approximately 30 minutes. *These are Parker Drilling's failings* found *in the face of clear notice they had created an unsafe work space and dangerous condition and that no sufficient replacement providing safe access had been created, installed, or implemented.*

Further evidence of Parker Drilling's failure is the fact Parker Drilling's *toolpusher, their supervisor on the rig*, knew Mr. Semien had requested help and heard, at least, Palfrey's side of the conversation when Palfrey told Mr. Semien he would be there in 10 minutes, and yet, the toolpusher did not inquire or ensure Palfrey was going to provide the help as promised, or at all, in spite of Parker Drilling's "buddy policy." Rather, with full knowledge of the request and promise of help, Palfrey and Villejoin left the toolpusher's office together and went not to help Mr. Semien, but to another job in either the pump or mud room, which Villejoin said would take approximately 30 minutes. Clearly, Palfrey *and Villejoin* knew Mr. Semien had requested the very help Parker Drilling argues their "buddy system" required, and Palfrey and Villejoin both knew Palfrey had told Mr. Semien he would be there in 10 minutes, yet, for some unknown reason, Villejoin went off to do a

30 minute job *with Palfrey in tow.*

Although there was some disputed and quite vague testimony that Palfrey might have believed Semien could wait - this Court finds that testimony without credibility, particularly in the face of certain of Parker Drilling's own investigative documents that echo Palfrey's reference to 10 minutes as the relevant time involved. See Plaintiff's Exhibit 16, p. 11, para 6; p. 17.

Mr. Villejoin testified Mr. Palfrey was in Villejoin's office when Palfrey received the call from Mr. Semien, and that, therefore, Mr. Villejoin only heard Mr. Palfrey's part of the conversation – however, Palfrey's part of the conversation included the promise to go in 10 minutes. Mr. Villejoin went on to testify that after the call, Mr. Palfrey, perhaps, did not know why Mr. Semien had requested his assistance, only that Mr. Semien had requested relief, and that it was even possible Mr. Semien simply needed to go to the restroom and as a result of Mr. Palfrey's description of the call, he felt no urgency to get assistance to Mr Semien. This Court finds that testimony when compared to the other evidence presented, wholly without credibility. Rather, this Court finds it credible that Mr. Semien would have explained the urgency to Palfrey *just as he had to the driller, Landry,* if for no other reason than to explain why not only Palfrey, but, also, his helper were needed, and to let Palfrey know where Palfrey was to go, as Mr. Semien was not at his usual duty station, and what Palfrey was to do, and why. Landry admits in his testimony that Mr. Semien fully explained to Landry (the driller) that the tanks were filling up and the pumps were not working and the manual "dump valves" would have to be used. Thus, this Court finds it more probable than not that Mr. Semien fully explained the situation not only to Landry - as Landry testified - but, also, to Palfrey, again, if for no other reason than to let Palfrey know why he <u>and</u> his <u>helper</u> were needed, <u>where</u> he was needed, and <u>for what</u> he was needed. Consequently, it is reasonable to accept Semien's testimony that he told Palfrey much the same he told Landry.

35

Therefore, this Court finds up to the point he began up the ladder, Semien did exactly what he was required to do by Parker Drilling's policy, *i.e.*, he called the driller (Landry); told him he needed help and why; did what Landry told him to do by calling Palfrey and telling Palfrey what he needed and why, and was assured by Palfrey that he, Palfrey, would be there in about 10 minutes; and that Villejoin was aware of both the call and Palfrey's promise to provide help in 10 minutes, and, yet, Villejoin left with Palfrey headed to another job in another area of the rig that would take approximately 30 minutes and neither inquired nor ensured that Mr. Semien would receive the very help Parker Drilling now argues is paramount for safe operation and should exonerate Parker Drilling.  Additionally, it should not be over looked that the testimony is clear that Mr. Semien initially was not intending to do the job himself.  Rather, Mr. Semien testified he went to the lower level *to prepare the work area for Palfrey and his helper to do the job.*  Landry, also, testified that from what Mr. Semien had told him, he, *Landry, assumed Mr. Semien needed help fairly quickly, and he expected that help would arrive soon.*   And yet, the testimony establishes that, notwithstanding Palfrey and Villejoin's training and what they knew and what had been promised, they did not provide the requested help; indeed help never arrived.  Landry further testified that while he did not recall being aware there was a danger of the tanks overflowing, *he was aware that Mr. Semien needed help quickly, and expected help to arrive as requested.*  Parker Drilling cannot escape the fact that up to this point  Mr. Semien complied with his instruction and training; Mr. Landry complied; however, Palfrey, and the tool pusher, Villejoin, did not.  Nor can Parker Drilling avoid the fact that had help come as promised and as expected by both Landry and Mr. Semien, and as Parker Drilling argues their "buddy system" requires, this accident would not have happened.

This Court, therefore, concludes that, up to the point Mr. Semien decided to go forward on his own, Mr. Semien and Landry had done everything pursuant to Parker Drilling's argued policies;

Parker Drilling employees, Palfrey and Villejoin, however, had not.

Again, Parker Drilling's argued safety policies broke down at and in each instance, individually and collectively . Palfrey – who this Court finds, along with the toolpusher, had full knowledge that he was supposed to go and help Mr. Semien and promised to do so in 10 minutes – did not; the toolpusher who was with Palfrey when Mr. Semien called for help and should have been aware of the importance of the argued "buddy system" and who heard Palfrey promise help in 10 minutes, and should have ensured help was provided – did not. Indeed, the testimony makes clear that Palfrey *never went to help Mr. Semien*, rather went *with Villejoin to another job* that would take 30 minutes. Again, it bears repeating that Palfrey testified that when he found Mr. Semien – potentially *some forty-five minutes after* he and Mr. Semien spoke – *Palfrey was still engaged in the other project* (*i.e.*, obtaining a tool for a job he was doing with or for the toolpusher and training new employees). Parker Drilling is responsible for the actions of its employees, and the failure of its employees, such as Palfrey and Villejoin, to honor their own argued safety policies.

Also, Parker Drilling's argument that there has been no recorded injury over the seven years after the permanent ladder was removed, up to Mr. Semien's accident,  is not as persuasive as it might seem at first blush. The driller testified using the manual valves was not a usual occurrence, and, although, in this instance, this Court concludes Parker Drilling's policy and policies broke down, this Court cannot know whether Parker Drilling's argued safety policies might or might not have been honored by their employees, such as Mr. Villejoin and Mr. Palfrey, in the past. However *in this instance* there should be little dispute those argued policies were not honored.

Therefore, considering the foregoing, this Court finds Parker Drilling removed the permanent ladder that accessed the manual valves, did not replace that ladder with either another physical structure allowing safe access to the valves, or with a work system that provided adequate

precautions for the protection of their workers who had to work in an unsafe work area and in a dangerous condition of their own making, and that Parker Drilling's employees, themselves, did not honor the very safety policies now argued. Therefore, this Court finds Parker Drilling did not take sufficient precautions to protect their employees from a dangerous and unsafe work place of their own making and this Court concludes Parker Drilling was negligent in creating a dangerous condition, failing to provide a safe work place to work, and failing to take the necessary precautions to protect their employees who had to work in that area.

### D.   Comparative Fault

This Court, having found fault on the part of Parker Drilling, now turns its attention to Parker Drilling's argument that Mr. Semien, also, was at fault. For the reasons noted above and for those to follow, this Court finds Mr. Semien's own fault, also, contributed to his injury, at the moment he chose to prop an approximately 14 foot extension ladder, against a round manhole cover, on a wet deck, and to climb that ladder alone without a harness or any other kind of fall protection, all the while attempting to physically manipulate a valve that required jerking the valve with great force, and again, all from this precarious position.[12] Whether any one of these choices might or might not, standing alone, have violated a Parker Drilling policy or alone, constitute negligence on Mr. Semien's part, is a question this Court need not address, as this Court finds *the collection of these choices* constitutes negligence on his part.

Although Mr. Semien testified he was rushing given the state of the tanks, and therefore, did not have time to make better choices such as perhaps, getting a harness, or, perhaps, finding another ladder, or, perhaps, waiting longer for the requested help to come, this Court does not find such

---

[12] Mr. Semien testified that in order to open the manual valve, it was necessary to use significant force to squeeze a "wing" on the valve handle in order to remove the handle or wing from a notch which otherwise kept the handle stationary.

testimony wholly persuasive. Mr. Semien's testimony clearly shows he had and did take the time

to prepare the work area for Palfrey, which included getting his own life jacket, arranging the

elephant hose, going onto the barge, propping the ladder on the wet deck, and visually checking the

float in the tank gauge. Mr. Semien testified he prepared all that was required for Palfrey and his

helper to do the job, and yet, he did not get fall protection for them to use, notwithstanding his

knowing that anyone who climbed that ladder would require fall protection. Mr. Semien knew that

whomever was to climb that ladder would need fall protection - whether a harness or a tie off – and,

yet, chose not to get a harness or a tie off for Palfrey or Palfrey's helper.  Thus, Mr. Semien clearly

picked and chose which choices to make and which safety policies to follow, much as did Villejoin

and Palfrey. Mr. Semien took the time to follow some of Parker Drilling's safety standards and to

take certain safety precautions, while clearly ignoring others and chose to go forward in a manner

fraught with risk and poor choices.  At the point when he began climbing the ladder, Mr. Semien

knew he was using an extension ladder - which is inherently less stable than an A-frame ladder -

knew he had merely propped that extension ladder up against *a round* manhole cover and a pipe

above, on a *wet* deck, and that he was working alone, and without any fall protection. Mr. Semien,

– a skilled offshore worker – knew he was going to have to physically manipulate the manual valve

once he got to the top of the ladder, and that such work would require physical force.  Even if this

Court were to find Mr. Semien violated *none* of Parker Drilling's argued safety standards in

undertaking such a task as he did, this Court would, nonetheless, conclude Mr. Semien bears part

of the responsibility for his accident as he  undertook clear, unnecessary, risks when acting in the

manner in which he did.

However, even in the face of Mr. Semien's negligence, Parker Drilling cannot escape the

reality of its negligence. Had Parker Drilling replaced the rig access, or had Parker Drilling's

employee Palfrey come in 10 minutes, as he promised, or even come at all, or had Villejoin ensured Palfrey went to help as promised or as required by the "buddy system," Mr. Semien's accident would have been avoided.  Thus, the *actual operation* of Parker Drilling's argued safety policies and the precautions it argues, in fact, *created the situation* that prompted Mr. Semien's conduct.  Had Parker Drilling not created an unsafe work area and dangerous condition to begin with, or had Parker Drilling's policies operated as argued or had help come, Mr. Semien's accident would have been prevented.  Thus, this Court finds it required both Parker Drilling *and* Mr. Semien's negligence to act in concert to cause the accident and, therefore, Mr. Semien's subsequent injury.

The foregoing demonstrates how the conduct of each party – Mr. Semien *and* Parker Drilling - broke down along the way, each falling beneath the requisite legal standard of care, and each contributing to  Mr. Semien's accident.  Therefore, having heard all of the testimony and having benefit of all of the evidence at trial, this Court concludes Mr. Semien and Parker Drilling share equally – 50%  and 50% – in the fault as to Mr. Semien's accident.

### Credibility

Parker Drilling argues vehemently as to Mr. Semien's lack of credibility, in general, and to the lack of validity of his continuing complaints of pain, and now his argued only recent allegation of Parker Drilling's negligence.  However, as to the complaint of pain, after hearing both doctors' testimony, and without knowing the results of the recommended arthrosporic procedure, this Court cannot know whether the pain Mr.Semien describes is residual or its degree; however, this Court is presented with the company's selection, Dr. Shults' testimony that one having the type of surgery Mr. Semien had will suffer from pain for an extended period of time.  Until the recommended arthroscopy is performed and the actual condition of his knee known, this Court cannot say Mr. Semien's complaints are invalid, but must note the company's selected surgeon's own testimony on

this issue.   Certainly, Mr. Semien's use of a cane - which was not prescribed by any healthcare provider - could suggest some level of exaggeration on the part of Mr. Semien, and additionally, Parker Drilling argues, and Mr. Semien agrees, Mr. Semien has made no effort of any kind, whatsoever, to obtain employment of any kind or to obtain any recommended vocational rehabilitation counseling or to engage in any remedial reading or educational instruction of any kind since the time Dr. Shults declared Mr. Semien had reached maximum medical improvement. However, there is little doubt that Mr. Semien could not have afforded the cost of the vocation rehabilitation services, and, according to both vocational rehabilitation experts, Mr. Semien likely could not have obtained meaningful employment without those recommended services.  However, it does not go without notice that Mr. Semien has made no effort of any kind to find work of any kind - he can by his own testimony, mow yards with his riding lawnmower and mows yards other than his own – or to find and participate in any of the available educational or adult reading instruction for older individuals such as he.

Parker Drilling, also, relied heavily on the Functional Capacity Evaluation ("FCE") performed by Mr. O'Dell, as Mr. O'Dell opined Mr. Semien did not exert full effort during the FCE, and, perhaps this is correct.  However, on further inquiry, it became clear Mr. O'Dell relied on certain written tests to compare against the physical performance to reach his conclusion, and it is clear Mr. Semien did not tell, nor did Mr. O'Dell ascertain, that Mr. Semien does not possess the reading comprehension skills to have been able to have read and comprehend those written portions of the evaluation on his own. Although, Mr. O'Dell couldn't recall whether Mr. Semien's wife was present to help, it remains that Mr. Semien did not have the capacity to understand those written portions of the evaluation. Therefore, to the extent Mr. O'Dell's opinion rested on comparison of the written portions of the testing, to his physical performance, that evaluation is severely weakened.

Additionally, testimony, also, revealed certain internal incongruities in the report resulting from the software used during the FCE, which further weakened Mr. O'Dell's conclusion. Therefore, this Court does not rely on the FCE to establish either Mr. Semien's physical abilities or limitations, or his credibility during that testing process.

Parker Drilling, also, strongly argued that Mr. Semien lacked credibility because only of late has he argued that Parker Drilling was negligent, whereas, soon after the injury, Mr. Semien indicated that he had no one to blame but himself. Whether Mr. Semien's statement reflects a knee jerk response to knowing he had chosen an unwise set of choices or is an actual admission, is unknown. However, as discussed above, the evidence and testimony produced at trial, establishes Mr. Semien *and* Parker Drilling share equally in the fault leading to Mr. Semien's accident under applicable law.

### E.    Maintenance and Cure Claim

Mr. Semien's maintenance and cure claims key to whether Mr. Semien, in fact, reached maximum medical cure on May 15, 2014 – as found by Dr. Shults – and/or whether he should be permitted to re-institute his claim for maintenance and cure arguing additional curative treatment is needed and available. The accepted legal standard holds that maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition. *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979), *citing Farrell v. United States*, 336 U.S. 511, 69 S.Ct. 717, 93 L.Ed. 850 (1949); *Brown v. Aggie & Millie, Inc.*, 485 F.2d 1293 (5th Cir. 1973); *Myles v. Quinn Menhaden Fisheries, Inc.*, 302 F.2d 146, 150 (5th cir. 1962). Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering (that is, be palliative in nature) but, not otherwise, improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved. *Stewart v. Waterman S.S.*

*Corp.*, 288 F.Supp. 629 (E.D.La. 1968), *aff'd*, 409 F.2d 1045 (5th Cir. 1969), *cert. denied*, 397 U.S. 1011, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970).

It is undisputed that Dr. Jonathan Shults found Mr. Semien reached maximum medical cure on May 15, 2014 and that Mr. Semien sought no additional treatment for approximately a year until he sought care from a nurse practitioner (Tamatha Newman), who referred Mr. Semien to Dr. Clause. In an attempt to determine the origin of Mr. Semien's complaint of knee pain, Dr. Clause reviewed Dr. Shults' records and notes and did additional testing of his own.  Unfortunately, the conducted MRI of Mr. Semien's knee – ordered by Dr. Shults and reviewed by Dr. Clause – showed a small metallic fragment which distorted the magnetic image of the MRI, further reducing the MRI's ability to determine the true condition of the knee and the "pictures" of the arthroscopic procedure performed by Dr. Shults were grainy and of little use to Dr. Clause.  Consequently, because of what he considered to be inconclusive testing, and because Mr. Semien did respond to certain treatment - particularly Synvisc injections - Dr. Clause believed there could be a medical issue underlying Mr. Semien's knee pain and, although, admittedly almost as a last resort, Dr. Clause suggested a second arthoscopic procedure to properly diagnose Mr. Semien's condition; Parker Drilling refused to provide that procedure and thus, it has not been performed.  Dr. Clause has opined that Mr. Semien may have an underlying medical condition, osteoarthritis, at play in his knee resulting from his injury that is causing pain, which could, potentially, make him a candidate for additional curative treatment, and, ultimately, a future knee replacement.

Both doctors testified at trial, and the Court found each to be credible and well-qualified, and neither to have a prejudicial agenda. Dr. Clause testified he believes there could be arthritis in Mr. Semien's knee, traceable back to Mr. Semien's original injury, which will worsen and if so, there is an 85% chance Mr. Semien will need  knee replacement surgery in the future as a result and he

recommends another arthoscopic procedure to determine if this is the case.  The only doctor to have performed an arthoscopic procedure on Mr. Semien's knee to this point – Dr. Shults -- testified he believes Mr. Semien is not suffering from arthritis and there is not now, nor will there ever be, a need for knee replacement surgery resulting from the original injury.  In contrast,  Dr. Clause has, in an effort to determine the cause of Mr. Semien's complaints of pain, recommended an arthroscopic procedure; Dr. Shults, believes such a procedure is not warranted as Mr. Semien's complaints are too, and, only, generalized.

The testimony established Mr. Semien underwent two surgical procedures with Dr. Shults. During the second procedure, an arthroscopy, Dr. Shults found cartilage reduction which he believed was caused by the plica rubbing against the cartilage, and opined this plica syndrome was a result of the original trauma, ostensibly caused by Mr. Semien's workplace accident. During the arthoscopic procedure, Dr. Shults repaired Mr. Semien's plica syndrome and therefore, opined there should be no more reduction in cartilage and that there remains no bone-on-bone movement which could cause the suggested arthritis. Both doctors, however, testified, arthritis is more likely when there is "bone on bone" contact in an area which articulates; and both doctors testified, that the "gold standard" to determine whether there is bone-on-bone contact in the knee and where – and thus, whether osteoarthritis is likely at play – is an arthoscopic procedure.

This Court finds that the source of the disagreement between the two doctors is one of miscommunication. The two doctors used different scales to describe the condition of the knee, and in particular, the level of "bone-on-bone" contact in the knee, a pivotal issue in the conflicting diagnoses. Dr. Shults' operative notes reflected that Mr. Semien's knee condition was a level 4.  For Dr. Shults, a level four is *almost* bone-on-bone, but not quite, Dr. Shults believing there is a more advanced level,  level 5, which would describe bone-on-bone contact.  However, Dr. Clause – who

read and evaluated Dr. Shult's operative reports – employs a different scale; for Dr. Clause level 4 is the highest level used and indicates bone-on-bone contact. Both doctors agree that if there is bone on bone contact and articulation, arthritis can form, and therefore, pain can exist, and a future knee replacement will be indicated. However, if there is no bone on bone contact in an area of the knee subject to movement, arthritis is not likely to develop and, thus, arthritis is not a likely cause of pain, nor is a knee replacement likely to be needed as a result of Mr. Semien's original injury. Dr. Clause further testified a future knee replacement would be curative in nature as it would increase mobility and Mr. Semien's ability to walk and would be traceable back to his workplace injury.

Dr. Shults admits the only way to know if there is bone-on-bone contact at this point is to perform another arthoscopic procedure, however, Dr. Shults does not believe such a procedure is warranted because of the absence of objective findings and because he believes Mr. Semien's complaints of pain are "too generalized." Dr. Clause disagrees and believes because Mr. Semien had relief from the Synvisc injections, there could be a medical cause for Mr. Semien's pain. Dr. Shults believes Synvisc injections to be mere placebos. Thus, in order to definitively determine the actual condition of Mr. Semien's knee, and in order to determine whether Mr. Semien will need a knee replacement in the future – as a result of his workplace injury as opposed to normal wear and tear – the doctors are in agreement that an arthoscopic procedure would need to be performed.

As noted earlier, the request for an additional arthoscopic procedure was made and denied by Parker Drilling; therefore, this procedure has not been performed. Given the miscommunication between the doctors – and the doctors' agreement that the "gold standard" to determine whether there is bone-on-bone contact and possible osteoarthritis present is an arthoscopic procedure, and that knowing whether arthritis exists within Mr. Semien's knee is pivotal to knowing if curative treatment is required now or in the future, this Court concludes the recommended arthroscopy is

diagnostic in nature, is necessary to determine whether additional treatment is mandated, and is a part of Parker Drilling's cure obligation. Therefore, this Court concludes the recommended arthroscopic procedure falls under Parker Drilling's obligation of cure and orders Parker Drilling to provide the arthroscopic procedure recommended by Dr. Clause. Furthermore, the Court notes that should the procedure reflect there is bone-on-bone contact and that osteoarthritis is at play, this Court notes Parker Drilling is at risk of owing additional cure, which could, also, trigger additional maintenance obligations, for any period of curative treatment. Such obligations could include – at the appropriate time – and if medically required, knee replacement surgery and daily maintenance during that time. Both doctors share the opinion that Mr. Semien is not a candidate for knee replacement surgery at this time and will not be for quite some time. However, both doctors agree that if osteoarthritis is at play, at some point a knee replacement is the likely result, and, as noted, Dr. Clause ties the knee replacement back to the trauma of Mr. Semien's workplace injury. However, as applicable law does not afford award of maintenance or cure likely to be needed in the future, this Court makes no monetary award for any possible future knee replacement, rather, orders Parker Drilling to provide the recommended arthroscopic procedure. Thus, this Court finds there exists a need for an additional arthroscopy in order to know the true condition of Mr. Semien's knee and orders Parker Drilling to provide that procedure. Without knowing the true condition of Mr. Semien's knee, to order maintenance, *at this time,* would be overly speculative; however, should additional curative treatment be appropriate and mandated, Parker Drilling's maintenance obligation could be, at that point, triggered.

## VIII. Damages

This Court having found liability on the part of Parker Drilling under negligence, now turns its focus to what damages might be owed by Parker Drilling as a result of its negligent conduct. As

46

this Court has found Parker Drilling's negligence was a legal cause of Mr. Semien's injury, Mr. Semien is potentially owed recovery for pain and suffering, unpaid medical expenses (past and future) lost wages (past and future), the value of fringe benefits he would have received absent the injury, the value of household services Mr. Semien can no longer perform, and vocational rehabilitation services that might be required for Mr. Semien to reenter the workforce, all of which will be discussed below.

### A.   Unpaid Medical Expenses

The parties agree that all of Mr. Semien's medical costs related to his knee injury have been paid by Parker Drilling under the obligation of cure, except for those costs related to his treatment by Dr. Clause.[13]

First, distinction must be made between Parker Drilling's obligation for cure - which terminates once maximum medical cure has been reached and when any additional treatment would be palliative only in nature, and Parker Drilling's obligation in damages under the Jones Act, which is not defined by the noted limitations, but, rather, by the concept of damages being overly speculative. Thus, Parker Drilling might not owe the cost of purely palliative treatment under its cure obligation, but, might owe those same costs under it's negligence obligations. By way of example, in this instance, Parker Drilling will not owe the costs of the Synvisc or Synvisc-One injections under its past cure obligation, but will owe those costs under its negligence obligation, and it should be noted that as to those costs which might be owed under both obligations, of course, double recovery is not allowed.

The parties agree that under Parker Drilling Company's *cure obligation*, Mr. Semien's past

---

[13] The parties agree that while Mr. Semien has, also, been treated by Tamatha Newman, a nurse practitioner, and that Parker Drilling has not paid any costs associated with her treatment, Mr. Semien is not seeking to recover those costs.

medical costs have been paid and therefore, Mr. Semien could only be entitled to those costs relating to Dr. Clause's treatment that are not palliative, however, this Court finds the full cost of care provided by Dr. Clause is owed to Mr. Semien *by way of damages*.  Mr. Semien's Exhibit 20,  shows the cost of Mr. Semien's treatment by Dr. Clause through early January, 2016 up to trial.  The Court finds based upon Dr. Clause's testimony, that certain aspects of Dr. Clause treatment is owed under cure, but, also, finds all of Dr. Clause's care is owed under damages.  And this Court further finds, based upon Dr. Clause's testimony, that Dr. Clauses' past care is not so speculative in nature as to be excluded from damages under Parker Drilling's negligence obligation.  Therefore, this Court finds the treatment provided by Dr. Clause is related to Mr. Semien's original injury, and finds Mr. Semien is entitled to Dr. Clause's fees, $1,525.12.[14]

This Court finds, however, that based upon the evidence and testimony presented at trial, and for the reasons noted above, Mr. Semien is due no amount for future medical expenses under Parker Drilling's negligence obligation,  as at this point any such award would be overly speculative in nature, but notes an obligation might be found under Parker Drilling's cure obligation as explained above.

### B.    Past Lost Wages

Under applicable law, Mr. Semien is due his past lost wages from the time of his injury to trial, and, future lost wages from the trial into the future.  Based upon the evidence presented at trial, the Court finds  Mr. Semien is owed full recovery of his lost wages from the date of his injury until May 15, 2015, or one year after he allegedly reached maximum medical improvement, and, thereafter, is owed his lost wages, past and future, reduced by the amount he could have earned had

---

[14] This number represents the charges for the treatments and visits noted by Dr. Clause in his medical records, excluding charges labeled "deposition" and "special reports/forms."  *See* Plaintiff's Exhibit 20.

he returned to work. Mr. Semien was injured on May 22, 2013, underwent two surgical procedures, and the treating physician, Dr. Shults, released Mr. Semien on May 15, 2014, at which point he opined Mr. Semien had reached maximum medical improvement.   However, both vocational rehabilitation experts, Stephanie Chalfin and Bob Gisclair, testified that given Mr. Semien's severely limited academic abilities, Mr. Semien would require approximately six to twelve months of vocational rehabilitation, counseling, and job placement services before it would be feasible to assume he could successfully return to the workforce.   The estimated costs of those services was agreed to be approximately $5,000.   Both vocational rehabilitation counselors agreed that Mr. Semien could have begun vocational rehabilitation as of May 15, 2014.   Given their testimony that it would take up to a year before Mr. Semien would be in a position to find work, the Court finds that Mr. Semien is entitled to full recovery of his lost wages from the date of his injury through one year after he was released by Dr. Shults, *i.e.*, until May 15, 2015, and, thereafter, this Court finds, based upon Ms. Chalfin and Mr. Gisclair's testimony, that Mr. Semien could have returned to work earning approximately $8.43 per hour and thus, any wages owed should be reduced by that amount.[15]

This Court notes that, based upon the vocational rehabilitation experts' testimony that if Mr. Semien were to receive the requisite counseling and were to return to work, Mr. Semien's earning capacity would be approximately $8.43 per hour, or $17,534 per year. Ms. Chalfin calculated Mr. Semien would most likely be able to find work with wages in the range of $7.25-$9.43 per hour. Mr. Semien's economic expert, John Theriot, calculated the average of his range to be $8.43 per hour, and based a calculation on that average. Mr. Gisclair's estimation of Mr. Semien's possible wages

---

[15]Again, this Court notes that it is not unaware of Mr. Semien's argurment he has yet to reach maximum medical improvement and therefore, could not or should not be or have been expected to have returned to work. However, again, this Court notes and finds that without additional evidence as to the true condition of Mr. Semien's knee, and that even as to the medical argument made as to osteoarthritis, a condition that is progressive and not immediately wholly incapacitating, to award complete lost wages for this period would be overly speculative.

is largely in line with Ms. Chalfin's, ranging from $7.25-$11.01 per hour, creating a similar average. However, while Ms. Chalfin's calculations were based on job markets local to Mr. Semien's residence (Oakdale, Opelousas, and Lafayette), Mr. Gisclair's were based on the job markets in Lafayette Parish, the entire State of Louisiana, and the entire United States. Given the level of agreement in the estimations of the parties' two experts, and the low likelihood that Mr. Semien would be able to relocate to find work, this Court finds $8.43 per hour, or $17,534 per year, to be a credible base estimation of his earning capacity as of May 15, 2015. Any award for lost wages after that date should, therefore, be reduced to account for that finding. Both parties' economists provided calculations considering these findings, and this Court relies on those calculations as its base for its economic determinations as to lost past and future wages.

Credible evidence and testimony, also, were presented by Parker Drilling that Rig 54B – on which Mr. Semien had spent the majority of his time working for Parker Drilling and its predecessor, Mallard Bay Drilling – was stacked for part of the time between Mr. Semien's injury and trial, and that Mr. Semien would not have been included on the skeleton crew, but, rather, would have in effect been laid off during that time. Given the testimony of the two rehabilitation specialists as to Mr. Semien's work history and severe academic limitations, this Court finds it more probable than not that Mr. Semien would not have found other employment with another company or in another field while he was laid off from Parker Drilling.

Thus, as to past lost wages, only, this Court finds any amount awarded should, also, reflect this fact. Thus, based upon the foregoing and the testimony heard at trial, this Court finds Dr. Dennis Boudreaux's testimony, as to past wages lost during that time persuasive and thus, the time Mr. Semien would have been laid off has been factored into the lost wages award. Thus, this Court finds Mr. Semien's award for past lost wages to be $122,548.

### C.   Advances

The parties entered the stipulation that Parker Drilling paid Mr. Semien advances in the amount of $24,614.48, during the noted time period, and both parties agree Parker Drilling is owed a credit in that amount. Consequently, this amount will be deducted from the past lost wage award creating an award for past lost wages of $97,933.52.

### D.   Future Lost Wages

The Court notes the parties' economists ultimately agreed as to Mr. Semien's work life expectancy, determining that he would work until approximately 62 years of age. The Court further notes both party's economists agreed as to the base wage amount to be used. Therefore, based upon the testimony at trial, this Court finds Mr. Semien would have had an earning base of $50,922 per year, once the Parker Drilling across the board wage and rank reductions are factored in. Evidence and testimony were presented that Parker Drilling imposed two reductions in pay prior to the date Mr. Semien could have first returned to work. These were (1) a small percentage reduction, accompanying demotions that were imposed on many or all Parker Drilling employees, and (2) a 10% reduction across the board imposed on all Parker Drilling employees. The parties' economists – both of whom this Court found credible – agreed on Mr. Semien's earning base prior to those reductions, *i.e.*, approximately $57,535 per year. Parker Drilling's economic expert, Dr. Boudreaux, calculated that after the two reductions, Mr. Semien's earning base would have been $50,922 per year, and this Court adopts that finding.[16]

Notwithstanding both of the economic experts using the same wage base of approximately $57,535 per year, Mr. Semien's counsel argued a base rate of $62,206 should be used, relying on

---

[16] Parker Drilling's economic expert testified that he included both wage reductions in his calculations, and opined that Mr. Semien's economic expert had included the reduction that accompanied the demotion, but not the 10% wage cut.

Defendant's Exhibit 17, a Parker Drilling document which reflects a base rate of $62,206 for one in

Mr. Semien's work category, and reflects that after the companywide demotions and the across the

board 10% wage reduction, one in that category would have earned $55,986 per year.  However, both

Mr. Semien's and Parker Drilling's economic experts accepted and adopted the $57,535 base wage

against which they made the calculated wage reductions, based upon other evidence, such as Mr.

Semien's actual  income tax returns, and, thus, began their reductions from that $57,535 amount.

No *evidence* was presented to explain the contextual basis of Defendant's Exhibit 17 – *e.g.*, whether

the rates reflected therein were average, mean, or median wages, or whether they reflected the actual

rate paid to any specific Parker Drilling employee, or whether the shown wage rate would, in fact,

have applied to Mr. Semien, and if so why the seeming contradiction with the other evidence

presented and relied on by both economic experts.  Given the ambiguity of Defendant's Exhibit 17,

and the agreement between the parties' economists on Mr. Semien's earning base, as well as the

documents supporting that agreement, the Court finds Mr. Semien would have earned $50,922 per

year after wage reductions, therefore, based on this yearly wage, and Mr. Semien's work like

expectancy, and relying in part on the testimony of Dr. Boudreaux,  this Court finds Mr. Semien's

lost future wages to be $288,337.[17]

### E.    Fringe Benefits and Meals – Past & Future

Additionally, this Court finds Mr. Semien is entitled to the value of those fringe benefits,

including meals, that were and would have been provided to him by Parker Drilling, but which will

not likely be provided by any future employer, given his work limitations.  Both economists agreed

Mr. Semien would be entitled to the value of the lost fringe benefits of his employment with Parker

---

[17]Although this Court found sufficient evidence to support a reduction of Mr. Semien's past lost wages by
the time the rig was stacked, this Court finds to attempt to project that finding into the future to be only speculative
and unsupported by the evidence presented.

Drilling.  Dr. Boudreaux testified that although his report included contributions to Social Security and retirement provided by Parker Drilling, it did not include the value of his employer contributions to health or dental insurance, as he believed Mr. Semien could acquire that insurance through exchanges established by the Patient Protection and Affordable Care Act.  On this point, the Court finds Mr. Theriot's testimony more persuasive, i.e., that employer contributions for the insurance Parker Drilling provided should be included in the calculation of loss.  The Court, therefore, relying on the adjusted calculations Dr. Boudreaux made at trial, finds Mr. Semien is entitled to the value of employer contributions for health and dental insurance over the course of Mr. Semien's work life expectancy, of $52,658.

Both economic experts agreed Mr. Semien was entitled to the value of the meals he had received and would have received while working on the rig, however, they disagreed as to what that value should be.  While Mr. Semien's expert, Mr. Theriot, based his estimate of $18,489 on a table published by the United States Department of Agriculture, Dr. Boudreaux pointed out that table includes only the value of the raw food itself, whereas he, by contrast, included the value of the food preparation as well, and calculated the value to be $40,100.  This Court finds Dr. Boudreaux's calculation on this point the more persuasive and therefore, relying on Dr. Boudreaux's testimony awards $40,100 for the employer-provided meals.  Consequently, this Court finds Mr. Semien is entitled to an additional recovery based upon the fringe benefits provided by Parker Drilling of $52,658 as the value of employer contributions to his health and dental insurances, and $40,100 as the value of employer-provided meals, creating a total of $92,758.

**F.    Household Services**

Mr. Semien, also, claimed he could no longer perform certain household services, and, therefore, should be due recovery for that loss, as well.  However, Mr. Semien, also, testified he

could still perform certain necessary household services. Thus, he does not claim a complete inability to perform all household services, but does claim loss of certain of those services. The report of Mr. Theriot – Mr. Semien's economic expert – included an amount to compensate Mr. Semien for loss of all household services; Dr. Boudreaux – Parker Drilling's expert – testified that he did not include such a calculation in his report because he had not been provided adequate information. At trial, however, Parker Drilling produced evidence and testimony that Mr. Semien employed a handyman known as "Dee" to perform certain enumerated functions which Mr. Semien could no longer do himself. However, the testimony of Mr. Semien, also, established "Dee" did not perform all the chores Mr. Semien could no longer perform himself. Dr. Boudreaux calculated the total value of the household services provided by "Dee" until Mr. Semien reaches approximately age 70 would be approximately $3,539. However, plaintiff's economic expert, Mr. Theriot, by contrast, consulted the Bureau of Labor statistics, which assumes complete inability to perform household services and a wage paid well above that paid to the handyman, "Dee," and suggested a value of $93,336.

As noted, Mr. Semien testified he can no longer perform only certain household activities, and for some of those, he employs "Dee" to do them instead. However, Mr. Semien, also, testified there were chores neither he nor Dee could or did do and also, that he still, regularly mows his and his mother's lawns, as well as an empty lot adjacent to his residence; that he does grocery shopping for his household, as well some cooking; and can perform other household activities. Thus, the Court finds Mr. Semien is not entitled to the full value reflected in the Bureau of Labor statistics as argued by Mr. Theriot; however, this Court finds evidence was presented at trial that "Dee" did not perform all of the household services Mr. Semien could no longer perform and, therefore, services remain unaccounted for. Thus, the true value of the household services lost by Mr. Semien will fall

somewhere between the estimates provided by the parties economic experts.

Given the evidence and testimony presented at trial by Mr. Semien, the vocational rehabilitation experts as to the state of the job market in the Oakdale area, and the evidence presented as to what Mr. Semien paid his handyman, the Court finds it reasonable that the value of the household services Mr. Semien can no longer perform, within his locality, will be lower than it might be nationally. However, the economists did not opine as to the value of the specific services Mr. Semien can no longer perform, only provided either the statistics assuming total disability, and the amount paid to the handyman. While the Court finds Mr. Semien is entitled to some value of household services, it finds neither economist's opinion fully persuasive. The evidence and testimony presented at trial suggest that Mr. Semien can perform approximately one third of the household services contemplated by the Bureau of Labor Statistics Table and further suggests "Dee" was paid to perform approximately one third of the services contemplated by the Bureau of Labor Statistics, but was paid an appreciably smaller amount than contemplated by the Bureau of Labor Statistics, leaving a final one third unaccounted for. This Court notes it is left with the evidence provided, i.e., Mr. Semien's testimony, the Bureau of Labor Statistics Table, and what Mr. Semien paid "Dee". Based upon Mr. Semien's testimony as to what he can and cannot do and what "Dee" did and did not do, the Court, finds Mr. Semien is entitled to only approximately one third of the value of household services as reflected in the Bureau of Labor Statistics Table, plus, the amount he would pay "Dee" for the more menial tasks he would perform, *i.e.*, a total of $34,651.

### G. Maintenance and Cure - Amounts Owed

As noted above, Mr. Semien was released by Dr. Shults on May 15, 2014. He was not treated for his injury for approximately one year, until he saw Tamatha Newman, a nurse practitioner, who referred him to an orthopedic surgeon, Dr. David Clause.

The parties agree Parker Drilling has paid for all medical costs requested that relate to this injury under the obligation of cure, except for certain expenses related to Dr. Clause's treatment and the recommended arthoscopic procedure, and has paid maintenance from injury until May 15, 2014, when Dr. Shults determined Mr. Semien had reached maximum medical improvement. Mr. Semien now argues both maintenance and cure should have been and should be reinstated in light of additional medical information and treatment. As noted, Dr. Clause, also, recommends an additional arthroscopic diagnostic procedure to establish the actual condition of Mr. Semien's knee; Dr. Shults does not. This Court finds any additional obligation for maintenance and cure obligations would largely be defined by the findings of that arthroscopic procedure.[18]

As to Parker Drilling's current cure obligation, the Court has found Parker Drilling is obligated to pay the cost of the recommended arthoscopic procedure and of the treatment of Dr. Clause until or unless such treatment is shown, by the results of the arthroscopy to, at that point forward, be palliative only. This Court finds the recommended arthoscopic procedure to be a necessary diagnostic procedure required to determine the true condition of Mr. Semien's knee. Depending on what the arthoscopic procedure reveals, Parker Drilling could be at risk for additional curative treatment, however, in light of applicable law as to cure and without knowing what the diagnostic procedure might reveal, this court awards no dollar amount, rather merely notes Parker Drilling's obligation under cure and finds the recommended arthroscopy is diagnostic and necessary in order to determine the actual condition of Mr. Semien's knee, and, thus, this Court orders Parker Drilling to provide the procedure recommended by Dr. Clause. Depending upon the finding of that

---

[18]The parties agree that under certain circumstances, an injured seaman may reinstate a demand for maintenance and cure when new curative treatments become available. *Ramirez v. Carolina Dream, Inc.*, 760 F.3d 119, 126 (1st Cir. 2014), *citing Farrell v. United States*, 336 U.S. 511, 69 S. Ct. 707, 93 L. Ed. 850 (1949). *See Pallis v. U.S.*, 369 Fed.Appx. 538 (5th Cir. 2010) (unpublished) and, therefore, cited for only informational and not precedential value.

diagnostic procedure, this Court notes Parker Drilling might be at risk for the cost of additional treatment - however, only if curative in nature - and for additional maintenance, however, only during that curative treatment period, i.e. until Mr. Semien were to again reach maximum medical improvement. Furthermore, both Parker Drilling and Mr. Semien are cautioned that should the procedure show there is "bone on bone" and possible osteoarthritis at play, Parker Drilling could be at risk of owing cure in the future that could include – at the appropriate time – a knee replacement surgery, as well as maintenance during the curative treatment process. However, if the procedure does not indicate such involvement, and the only treatment that might be available is palliative, Mr. Semien would be owed no additional payment under either cure or maintenance, now or for any future knee replacement not related to his original injury. All agree the law does not allow an award of future maintenance or cure, consequently, no dollar amount is awarded. However, Parker Drilling is ordered to provide the diagnostic arthoscopy recommended by Dr. Clause and to pay those costs, including Dr. Clauses's past and present treatment, associated with the arthoscopic procedure, no matter its result.

### Total Specific Damages

Consequently, this Court finds Mr. Semien is due specific damages in the amount of:

| | |
|---|---|
| Past lost wages: | $122,548.00 |
| Minus Advances: | -$24,614.48 |
| **Total past lost wages:** | **$ 97,933.52** |
| | |
| Future lost wages: | $288,337.00 |
| **Total Lost Wages:** | **$386,270.52** |

| | |
|---|---|
| Employer-provided meals: | $ 40,100.00 |
| Employer contributions to insurances: | $ 52,658.00 |
| **Total Fringe Benefits:** | **$ 92,758.00** |
| | |
| Past medical expenses: | $  1,525.12[19] |
| Future medical expenses: | $       0.00 |
| **Total Medical Expenses:** | **$  1,525.12** |
| | |
| **Required vocational rehabilitation:** | **$   5,000.00** |
| **Household services:** | **$  34,651.00** |
| **Total Specific Damages:** | **$520,204.64** |

### H.   General Damages

Mr. Semien underwent a radical surgery to repair his injuries, which Dr. Shults – the physician who performed the operation – testified is very painful, and after which patients are almost certain to have significant pain for a very long time.   Mr. Semien had a further arthoscopy that resulted in a second major surgery to, again, attempt to fully repair his knee and is at risk of yet, another arthroscopic procedure.   Mr. Semien testified, and told his two physical therapists and one of his doctors, that he had persistent and consistent pain in his leg as a result of the injury and/or the surgeries. Mr. Semien's testified his work, household activities, and hobbies have been significantly restricted as a result of the injury to his knee and the resulting pain and that he has not been able, nor will he be able to return to a job he loved and that had allowed him - a man with severe educational limitations - to provide for his family.

---

[19] The court further finds $585 of these past medical expenses is, also, owed under Parker Drilling's cure obligation, however, in order to avoid double recovery, the Court notes here only the full amount owed under Parker Drilling's negligence obligation.

Mr. Semien testified he has been in consistent and persistent pain since the injury, and that although the first surgery provided some relief and allowed his knee a greater range of movement, the pain in his knee and leg increased after the second surgery. The Court finds Mr. Semien's statement that he experienced pain between the two procedures credible, as, during the second surgery, Dr. Shults found that a plica had worn away some of the articular cartilage in Mr. Semien's knee. Dr. Shults remedied this condition during the second surgery, which began as a diagnostic arthroscopy, but became a therapeutic procedure, ultimately including a synovectomy, a partial medial meniscectomy, and a lateral release. Mr. Semien's descriptions of his pain are corroborated by the reports of Mr. Semien's two physical therapists, who testified of his complaints and testified they had no reason to disbelieve Mr. Semien. Additionally, Dr. Shults, the physician who performed both of Mr. Semien's surgeries, testified that patellar ligament repairs, such as the one performed on Mr. Semien, are quite difficult to recover from fully, and that the majority of patients who undergo that procedure will experience pain and/or weakness in the joint for an indeterminate period afterward. Mr. Semien has complained of pain consistently since the second surgery, but at this point, and without the recommended additional second arthroscopy, this Court cannot know definitively whether the more recent complaints of pain are residual to his previous surgeries, are the result of the suggested developing osteoarthritis, or are mere exaggeration as defendant argues.

Nonetheless, at trial, Mr. Semien testified he feels pain in his knee consistently, if not constantly, as well as shooting and/or burning pains down his leg, and that standing for long periods induces a feeling in his knee like bone rubbing on bone. Mr. Semien further testified that, due to the pain in his right knee, he has begun to favor his left leg and thus, has begun to experience pain in his left knee as well.

Consequently, this Court finds Mr. Semien has undergone two major surgeries on his knee and an additional arthroscopic procedure has been recommended which Mr. Semien has agreed to undergo. The operating physician testified the injury and treatment involved almost always results in significant pain over a long period of time. Therefore, this Court finds Mr. Semien has experienced significant pain from the time of his injury certainly up to and immediately after the second surgery, with residual pain, and finds, based upon Dr. Shults' testimony as to the nature of this type of injury and surgery performed, and upon Mr. Semien's testimony, that Mr. Semien is at risk of experiencing pain of some degree for an extended period.

Mr. Semien testified that before his injury, his hobbies included hunting, fishing, playing sports, taking walks with his family, and going on long trips. Also, pre-injury, Mr. Semien regularly performed yard work, including lawn mowing, raking, weed-eating, and removing sticks from his yard. He, also, regularly, washed the outside of his home and his family's vehicles, as well as cooked large meals, as well as engaged in other family activities he can no longer do. Due to his injury, Mr. Semien has been forced to restrict his activities or cease them entirely. He testified he cannot engage in sports, or take walks or long trips with his family. Through using a riding lawn mower, Mr. Semien is, however, still able to mow his and his mother's lawns, as well as an empty lot adjacent to his home, but he testified he needs help using a trailer to transport the mower. He can still do some grocery shopping and can cook small meals, but testified he is restricted in the amount of either he can now reasonably do. Having been his family's primary provider, Mr. Semien testified that he misses being able to be that now, and that he worries about how he will be able to afford any unexpected expenses that might arise. He, also, testified he has already cashed in his 401(k) retirement plan in order to survive financially and is worried about his and his family's financial future. Mr. Semien testified he loved his job and would like to be able to return to that work, but

knows that cannot happen given the condition of his knee.  Mr. Semien admitted that he has not pursued any other employment, education, or recommended rehabilitation, physical or educational, since his injury.

Therefore, this Court finds, based upon the testimony and evidence presented at trial that Mr. Semien is due recovery of general damages.  This court notes and the parties agree, general damages, such as compensation for pain, suffering, and impact on one's daily life, cannot be based on speculation, however, such damages are not restricted only to out-of-pocket lost money or lost time.  Rather, general damages may include the compensation for the mental and physical aspects of injury, both tangible and intangible.

On the basis of the foregoing evidence and testimony, the Court finds Mr. Semien is entitled to general damages in the amount of $200,000.

**Total Gross Damages Award**

In light of the evidence, testimony, and considerations described above, the Court awards recovery in the following amounts:

| | |
|---|---|
| Past lost wages: | $122,548.00 |
| Minus Advances: | -$24,614.48 |
| **Total past lost wages:** | **$ 97,933.52** |
| | |
| Future lost wages: | $288,337.00 |
| **Total Lost Wages:** | **$386,270.52** |
| | |
| Employer-provided meals: | $ 40,100.00 |
| Employer contributions to insurances: | $ 52,658.00 |
| **Total Fringe Benefits:** | **$ 92,758.00** |

| | |
|---|---|
| Past medical expenses: | $ 1,525.12[20] |
| Future medical expenses: | $    0.00 |
| **Total Medical Expenses:** | **$ 1,525.12** |
| | |
| **Required vocational rehabilitation:** | **$ 5,000.00** |
| | |
| **Household Services:** | **$ 34,651.00** |
| | |
| **Total Specific Damages:** | **$520,204.64** |
| | |
| **General Damages:** | **$200,000.00** |
| | |
| **Total Damages:** | **$720,204.64** |

This Court having found Mr. Semien fifty (50) percent at fault, therefore, reduces his award by fifty (50) percent. Thus, the total amount awarded to Mr. Semien for Parker Drilling's negligence is: **Total Damages Awarded:**                    **$360,102.32**

**I.      Interest**

The Court and the parties agree an award of prejudgment interest is within the discretion of the trial court when a Jones Act case is brought under the court's admiralty jurisdiction (and the case is tried to the court and not to the jury), even if there is not a finding of unseaworthiness. *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 491 (5th Cir. 1985).

This Court, however, in the exercise of its discretion does not award prejudgment interest in this case, noting that Parker Driller paid advances to Mr. Semien, up to maximum medical

---

[20] The court further finds $585 in past medical expenses is, also, owed under Parker Drilling's cure obligation, however, in order to avoid double recovery, the Court notes here only the full amount owed under Parker Drilling's negligence obligation.

improvement granting Mr. Semien use of that money during that period, and that Mr. Semien admitted making no effort of any nature to even attempt to engage in any educational activity of any kind, or to attempt to find any work of any kind.  For these and the other reasons included above, this Court declines to order pre-judgment interest.  The parties are **ORDERED** to present a judgment agreed to as to form reflecting the ruling of the Court within ten days of receipt of this ruling.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 5 day of April, 2016.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE